# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

OSWALDO AMEZCUA and JOSEPH CONRAD FLORES,
Defendants and Appellants.

S133660

Los Angeles County Superior Court
KA050813

February 28, 2019

Justice Corrigan authored the opinion of the court, in which Chief Justice Cantil-Sakauye, Justices Chin, Liu, Cuéllar, Kruger, and O'Rourke[*] concurred.

---

[*]    Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. AMEZCUA and FLORES

S133660


Opinion of the Court by Corrigan, J.


A jury convicted codefendants Oswaldo Amezcua and Joseph Conrad Flores of the first degree murders of George Flores, John Diaz, Arturo Madrigal, and Luis Reyes and found true multiple-murder and drive-by-murder special circumstance allegations.[1] The jury also convicted defendants of multiple counts of attempted willful, deliberate, premeditated murder, some of them relating to peace officers;[2] multiple counts of false imprisonment[3] in a hostage-taking incident; custodial possession of a weapon;[4] and various other offenses and enhancement allegations, including that many of the offenses were committed for the benefit of a criminal street gang.[5] The jury returned death verdicts for both defendants.

---

[1] Penal Code sections 187, 190.2, subdivision (a)(3), (21). Further undesignated statutory references are to the Penal Code.

[2] Sections 664, 187.

[3] Section 210.5.

[4] Section 4502, subdivision (a).

[5] Section 186.22, subdivision (b)(1) provides an enhanced sentence for certain offenses if they are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

The trial court sentenced each defendant to death for the murder convictions and imposed determinate and indeterminate sentences for the noncapital convictions. This appeal is automatic. We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution

##### a. April 11, 2000: Murder of John Diaz

The city of Baldwin Park is the home of the Eastside Bolen Parque (ESBP) gang. Defendants were members of ESBP. Not long after midnight on April 11, 2000, Paul Gonzales was riding a bicycle on Merced Street in Baldwin Park. His half-brother, John Diaz, rode on the handlebars. Diaz was a member of the Monrovia gang and had a "Monrovia" tattoo above his right knee. Gonzales was not a gang member. They passed a black sport utility vehicle (SUV) sitting at a red light. The SUV made a U-turn and came back toward the brothers on the opposite side of the street, then made another U-turn and pulled alongside them. Two people were in the car. As the SUV pulled past them, the passenger shouted, "Where you from?" Gonzales saw gunfire coming from inside the vehicle, jumped off the bicycle and crouched behind a parked car. The SUV sped away. Diaz approached Gonzales, told him to call an ambulance, and fell to the ground. He died at the hospital.

---

The jury found defendants not guilty of several other charges and was unable to reach verdicts on yet other charges, as to each of which the court declared a mistrial.

Sheriff's Sergeant Kenneth Clark processed the scene. He found five expended nine-millimeter shell casings, and a bullet hole in a residence on Merced Street. Gonzales described the shooter as being between ages 18 and 22, short-haired or bald-headed with a light complexion.

Doctor Vladimir Levicky, M.D., performed the Diaz autopsy. Diaz suffered a fatal gunshot wound to his left side, which perforated his liver and inferior vena cava. A second fatal wound to the back perforated his liver, stomach, and aorta. A third wound to the buttocks perforated his bladder. The bullet from Diaz's back was retrieved and booked into evidence.

In a recorded conversation with the trial prosecutor on February 21, 2002, defendants admitted they did the shooting.[6] Flores described how Diaz had been on the handlebars of a bicycle that his "friend or his brother" had been riding and noted that five nine-millimeter shell casings should have been found at the scene. In another recorded conversation with the prosecutor on March 28, 2002, defendants again admitted shooting Diaz. Flores said he did not kill the victim's brother because he was not a gang member.

After these interviews Gonzales identified a photo of Flores as the shooter. He did the same at trial.

Baldwin Park Police Sergeant David Reynoso, testifying as a gang expert, opined the shooting was committed for the

---

[6] Defendants spoke to the prosecutor on February 8 and 21 and March 28, 2002, when they were representing themselves. The circumstances of those conversations are set out in greater detail at pages 35–41, *post*.

benefit of ESBP. Based on defendants' recorded conversations with the prosecutor, Reynoso believed defendants shot Diaz because he was a rival gang member in territory claimed by ESBP, and the shooting was intended to promote ESBP's reputation.

### b. *May 25, 2000: Murder of Arturo Madrigal and Attempted Murder of Fernando Gutierrez*

On May 25, 2000, Arturo Madrigal was parking his Chevrolet Blazer near the corner of Rexwood Avenue and Maine Avenue in Baldwin Park. Madrigal's friend Fernando Gutierrez, who lived nearby, sat in the passenger seat. A car stopped next to the Blazer and someone inside said, "Where you from?" Gutierrez replied loudly, "We're not from nowhere." Someone in the other car started shooting and Gutierrez ducked under the dashboard. When the shooting stopped, he heard blood dripping from Madrigal. Gutierrez got out of the car and ran for help.

Gutierrez told police there had been four Hispanic men in the car. All were between 20 and 25 years old, with shaved heads. He testified neither he nor Madrigal belonged to a gang. He saw the assailants only briefly and was unable to identify anyone at trial.

Police Detective Mike Hemenway responded to the scene to find the Blazer parked near the corner of Maine and Rexwood Avenues with its engine running. Madrigal was dead behind the wheel; blood flowed from his ears and head. Lisa Scheinin, M.D., testified in lieu of the pathologist who performed the autopsy. She reported his conclusions that Madrigal died from a gunshot wound to the head that severed his brain stem. Several bullets were recovered and given to

investigators. Madrigal also suffered a grazing wound to one knee.

A sheriff's deputy recovered four expended nine-millimeter cartridge casings and one expended bullet near the Blazer along with one expended bullet from inside the driver's door. All had been fired from outside the vehicle and from the same gun. All four bullets from the Madrigal autopsy showed six lands and grooves with a right twist, consistent with having been fired from a nine-millimeter Smith and Wesson semiautomatic pistol.

Prosecution gang expert Reynoso testified that the Madrigal shooting was committed for the benefit of ESBP. He noted that Madrigal's head was shaved, creating a perception he was a rival gang member present in ESBP territory in an act of disrespect. The shooting added to the gang's notoriety.

In a recorded conversation on March 28, 2002, defendants provided trial prosecutor Levine and Detective Kerfoot with details of the shooting. Defendants were "driving around [the] neighborhood looking for people to kill." They saw "a gang member [that was] in the wrong area," driving an "older model Blazer." Amezcua was driving. Flores, using a nine-millimeter pistol, fired "two to three shots" that hit the victim in the face and neck. The passenger fled. Asked why they went out and started shooting people, defendants explained it was their "job." Flores said, "[W]e were trying to better the gang and [instill] fear to the rest of the gangs." He explained that the victim should not have been driving in "our hood"; he could have driven "the long way," but they had caught him taking "the short way," and Flores "domed him."

c. *June 19, 2000:  Murder of George Flores and Attempted Murders of Joe Mayorquin, Robert Perez, Jr., and Art Martinez*

Katrina Barber[7] knew both Amezcua and Flores.  About 11:30 p.m. on June 18, 2000, she was parked in front of her mother's house in a stolen Toyota Corolla.  Defendants asked her for a ride.  She drove around Baldwin Park and Alhambra until the Corolla broke down.  Barber then stole a Toyota Cressida and drove to the home of Flores's mother in Hemet.  They arrived about 3:00 a.m. and stayed the night.  When they left the next morning, defendants carried two black duffle bags.  One bag held Flores's clothes.  There were about 10 firearms in the other duffle.

Barber drove defendants to the La Puente home of ESBP member Luis Reyes.  The four watched television and used crystal methamphetamine, then left the house in two vehicles.  Barber took Flores in the Cressida; Reyes drove Amezcua in his Monte Carlo.  Parked near each other in a hotel lot, Barber saw Reyes talking with and giving something to a person in another car.

Barber then got on the freeway to go to her mother's house in La Puente.  In Baldwin Park, Barber drove past some men sitting on a wall in front of a house on Ledford Street.  At Flores's direction, Barber turned back toward the men and stopped.  The Monte Carlo with Reyes and Amezcua drove up and also stopped in front of the Ledford Street house.  Flores

_____

[7]     At the time she testified, Barber was in state prison.  She had pled guilty to shooting at an inhabited dwelling during this incident.

said to the men, "Well, well, well, what do we have here?" One of the seated men started to run. Standing outside the Monte Carlo, Amezcua fired a pistol at them. Flores, still inside Barber's stolen car and armed with an AK-47, also shot at the group. Then he handed Barber a .22-caliber semiautomatic, telling her to shoot. Barber fired three or four times toward the men without trying to hit them. One victim was shot as he tried to get in the house. When the shooting stopped, Barber drove away.

Robert Perez testified that on the morning of June 19, 2000, he was standing beside the wall in front of his Ledford Street home, chatting with his friends Art Martinez, Joe Mayorquin, and George Flores. Perez was not a gang member, but two of his friends were inactive members of the 22nd Street gang. All were unarmed. A Chevrolet Monte Carlo drove by, catching his attention because the men inside were staring at them. Perez's brother-in-law had been murdered in front of the house three years earlier, so he was constantly vigilant. The car turned around and approached. Perez told his friends to go to the back of the house, but Flores and Mayorquin stayed to see what would happen. The Monte Carlo and a woman driving a Toyota pulled up. Flores was seated in the Toyota and said, "Well, well, what do we have here?" Amezcua got out of the Monte Carlo holding a black pistol, said something, and fired the first shot. Perez jumped for cover and crawled toward the side of his house. He heard a metallic sound and the firing of a second gun from around the Toyota. When the shooting stopped Perez was uninjured, but George Flores lay dead from a neck wound and Joe Mayorquin had been shot in the leg. Perez later found bullet holes in his house and garage.

Sergeant Reynoso testified that, in his opinion, the Ledford Street shootings were committed for ESBP's benefit. The location of the offense was one claimed by ESBP. Victim George Flores belonged to a different gang but openly displayed his tattoos in ESBP territory. Killing him promoted ESBP's notorious reputation.

### d.  June 19, 2000:  Murder of Luis Reyes

After the Ledford Street shooting, Flores told Barber she could not go to her mother's house. As they drove toward San Bernardino the car began to shake. Barber got off the freeway and stopped, followed by Reyes and Amezcua in the Monte Carlo. Gathering her things, she heard gunfire and saw Amezcua shoot Reyes. Flores asked Amezcua, "What are you doing that here for?" Then he and Amezcua began to pull Reyes, bleeding and choking, from the car. Barber started to drive the Monte Carlo away, but Reyes's right leg was still inside. Flores told her to "[j]ust run him over," but she moved him from the car before driving off. They got back on the freeway and eventually stopped at the home of Amezcua's cousin in Pasadena. They took showers and ate. A few hours later, they went to the house in Hemet, bringing the black bag of guns inside. Flores's mother told him that if he didn't get rid of the guns she would sell them. He replied that if she did, he would have to kill her. The group stayed there three or four days. At one point, Barber asked Flores if he was going to kill her. He replied, "If I wanted to kill you, I would take you out back and shoot you. Throw you in the trunk and take you in the hills and nobody would ever know." Barber observed that his mother would know; he responded, "My mom wouldn't care

because she knew I had to do that to one of my friends," referring to his "homeboy Vago."[8]

On June 19, 2000, Andrew Quiroz saw a man lying beside the road and rushed to his side. The man had been shot but was still breathing. Quiroz called for help, which arrived within 10 minutes.

Sergeant Dean Brown responded to find Reyes lying in a pool of blood. A stolen Toyota Cressida parked nearby contained five shell casings. A bullet fell from the victim's clothing when he was lifted. Brown also found a spent bullet and shell casing in nearby weeds. An autopsy identified 19 gunshot wounds, shot from a distance of about two feet. Bullets recovered from the body came from a Ruger pistol linked to Amezcua.

---

[8] The court admonished the jury to consider Flores's comments only against himself. Other evidence showed that ESBP member Paul Ponce was nicknamed Vago. Defendants were charged with Ponce's murder and related allegations, but because they were acquitted of those charges, we briefly summarize the evidence. On June 7, 2000, Katherine Schafer and Paul Ponce were in his garage when they heard knocking at the front door. A closed-circuit video monitor showed a car parked in front of the house. Ponce left the garage to answer the door. After about 10 seconds Schafer heard numerous gunshots in quick succession. Several minutes later she found Ponce's body in the living room. Ponce, who had "Bolen" tattooed on his back, had been shot many times by .22-caliber and nine-millimeter weapons. The parties stipulated that on the day of the homicide, Schafer told a deputy sheriff that she had heard a vehicle drive up and seen a male subject come up to the front door. Ponce went to the door. As soon as he opened it Schafer heard gunshots.

Reyes's wallet contained a payment receipt for the Monte Carlo. Ontario police posted a bulletin that the car was wanted in connection with a homicide and its occupants were considered armed and dangerous.

Detective Reynoso testified that Reyes was considered to be a "rat" because he had cooperated with the police. He opined that Reyes was killed because his conduct was disrespectful to ESBP and his killing promoted ESBP's reputation.

### e. *June 24 and 25, 2000:  Attempted Murder of Peace Officer Andrew Putney and Arson of Reyes's Monte Carlo*

During the evening of June 24, 2000, Amezcua, Flores and Flores's girlfriend, Carina Renteria, went to a 7-Eleven store. Renteria drove Flores in her Honda Civic. Amezcua drove the Monte Carlo. Amezcua sped out of the parking lot and was followed by San Bernardino County Sheriff's deputy Andrew Putney. Renteria and Flores followed in the Civic.

The Monte Carlo's license plate showed it was stolen. Amezcua entered the 10 Freeway. He cut in and out of lanes at speeds between 70 and 85 miles per hour. After about two miles he made a hard right turn in front of Putney's vehicle, missed the offramp, and became airborne. He landed back on the ramp and sped off. Putney followed, heard gunfire from behind him, and a round blew out his front tire. Putney saw a dark compact car with tinted windows, going about 90 miles per hour. A Hispanic male was sitting in the passenger door window firing at Putney.

Renteria testified that after they had gotten onto the freeway, Flores told her to catch the patrol car. As she drew

closer, Flores rolled down the window, leaned out and began shooting. She had not known he was going to do that. Flores told her to keep driving and get off the freeway. She drove to his mother's house in Hemet. Shortly thereafter, Amezcua arrived in the Monte Carlo. He and Flores decided to burn the car. Renteria and Flores's mother secured a plastic gas container. Amezcua and Flores drove the Monte Carlo to an isolated area, and the two women followed in the Honda. After igniting the car, the men ran back to the Honda, and all four left together. Renteria stayed in Hemet overnight, then returned to her sister's house.

About 3:00 a.m. on June 25, 2000, firefighters found the Monte Carlo on fire in San Jacinto, a city adjacent to Hemet. Local police checked the license plate and contacted Ontario officers. Inside the car, police found bullets, casings and shells.

Sheriff's deputies interviewed Renteria, who thereafter pleaded guilty to being an accessory to arson. She testified at defendants' trial and received no consideration for doing so.

In a recorded conversation on February 21, 2002, prosecutor Levine told defendants, "You guys are—you're a good shot." Flores said, "Yeah, it's hard to shoot when you're in a vehicle and both vehicles are moving and one's turning." Levine said, "You hit that car a lot of times," and Flores replied, "Yeah. Oh, and . . . I should've had the other gun."

In a recorded conversation on March 28, 2002, Flores said they "do quite a bit of traveling, okay." Amezcua added, "With our duffle bags." Flores said, "Black . . . duffle bags." Later, Detective Kerfoot asked, "What'd you guys do with your duffle bags?" Flores said they couldn't tell him because "[i]f we ever get out, will we be able to go get 'em and we'll be able to finish

our mission?  'Cause our mission was not completed."  Kerfoot asked, "What was your mission?"  Amezcua replied, "To kill as much people as I could.  [¶]  Cops included."

### f. July 4, 2000:  Attempted Murders of Peace Officers; Assault with a Semiautomatic Firearm; Assault with a Firearm; False Imprisonments on Santa Monica Pier

Close to midnight on the night of July 3–4, 2000, Police Officer Robert Martinez received a radio call reporting that a triple homicide suspect had made a call from a public telephone on the Santa Monica pier.  Martinez went to the payphone, verified the number, and waited for additional units.  Martinez and six assisting officers walked toward the end of the pier and saw defendants standing outside an arcade.  Flores matched the description of the suspect.  Flores approached the officers, while Amezcua went into the arcade.  Martinez began to pat down Flores, who tried to turn away.  Martinez grabbed him and both men fell to the ground.  Flores was subdued by a police dog.  He had a semiautomatic AP9 handgun and a loaded semiautomatic pistol on his person.

Martinez told Sergeant Michael Braaten another suspect had gone into the arcade.  As arcade patrons began to leave, officers took up various positions.  Martinez yelled, "He's to the right," and Amezcua grabbed a woman named Cathy Yang.  Using her as a shield, he fired at Braaten, who took cover behind a pillar.  Officer Cristina Coria shouted, "I['ve] been hit," and Martinez carried her out of the line of fire.  Officer James Hirt was also shot in the leg.  Hirt saw Amezcua with his left arm around a woman's neck and his right hand pointing a gun.  Officer Steven Wong was struck in the right hip.

Jing Huali was leaving the arcade when she heard gunshots. She saw Amezcua holding someone and pointing a gun at her. She was wounded in the left leg during the gunfire.

Lorna Cass and Paul Hoffman were in the arcade with their respective children. They heard the sound of gunshots and took cover. Cass saw a man holding an Asian woman hostage. The man said to move the arcade machines closer together to form a barricade and told everyone still in the arcade to come together so he could see them.

Bonnie Stone and Michael Lopez were also present. Stone saw Amezcua with a gun in his hand holding an Asian woman around her neck. Amezcua controlled about 15 hostages, directing them where to sit. He told Lopez to reload bullets from one magazine into another and gave him the empty magazine as a "souvenir." After a few hours, Amezcua began letting hostages leave, singly and in pairs. He eventually surrendered after about five hours.

### g. *Defendants' Weapon Possession in Custody*

On January 29, 2001, Sheriff's Deputy Armando Meneses found a homemade stabbing device, or shank, hidden under the toilet rim in Amezcua's cell.

On April 30, 2001, a deputy found two large pieces of metal capable of being made into weapons hidden in the corners of Flores's bunk. Flores occupied the cell alone.

### 2. *Defense*

The parties stipulated that Andre Acevedo would have testified that Carina Renteria told him she was driving a car with three passengers when a police car drove in between

them.  The two men in the back seat told her to pull alongside the officer. When she did so, "they" rolled down the window and began shooting.

## B. Penalty Phase

### 1. Prosecution

#### a. Amezcua's Custodial Possession of a Weapon

On November 19, 2004, a sheriff's deputy found a shank hidden in Amezcua's jail cell.

#### b. Flores's Armed Robbery

On March 29, 1995, David Wachtel, Buddy Jacob, and a woman named Karen were parked in Baldwin Park, talking. Flores and another man approached and tapped on the window.  Flores asked if they had any money.  Initially, Wachtel refused to give him money or his wallet.  Flores showed him a gun and said, "Don't make me make you." Flores took Wachtel's pager and wallet, Jacob's necklace, and $20 from Karen's purse.  Flores left and police were summoned.  Wachtel identified Flores at a preliminary hearing.

#### c. Flores's Threat Against Jail Officer

On May 10, 2001, Sheriff's Deputy Dustin Cikcel removed contraband including excess sheets and food from Flores's cell. Flores was belligerent and later said, "You will see, Cikcel. Maybe not today, but you will see when you are not expecting it."  Cikcel took the comment as a threat.

#### d. Crimes Against Timothy Obregon and Alicia Garcia

On June 13, 2000, Timothy Obregon was living in Baldwin Park.  He was not in a gang but was a friend of ESBP member

Richard Robles. That evening, Robles called and asked Obregon to give his "homeboys" a ride home. Robles brought defendants to Obregon's house, introduced them, and gave Obregon $40. Flores put a large, dark duffle bag in the trunk. Obregon's girlfriend, Alicia Garcia, went along for the ride. Garcia sat in the front passenger seat with Amezcua and Flores in the rear.

Flores told Obregon to take the 10 Freeway east. No one spoke, which made Obregon nervous. At one point, Garcia complained it was taking a long time and asked how far they were going. A minute or two later, Obregon heard gunfire. Shots went through the windshield and Garcia "squirmed" in her seat. Amezcua reloaded his gun and started to point it at Garcia's head. Flores told him not to do that. Garcia started to cry and said, "He shot me, and I am dying." Blood streamed down from a hole in her chin. Obregon felt something at the back of his neck and Flores said, "Better drive straight, motherfucker, or I will shoot you with this nine."

At Flores's direction Obregon left the freeway at the next exit. The road was lined with tall cornfields. Flores said he would let them go in a place where Obregon could get help and told him to stop in a residential neighborhood. Obregon and Flores got out of the car. Flores demanded money, which Obregon gave him. Obregon lifted Garcia from the car and put her down on the sidewalk. Flores asked Obregon, "Do you know me?" Obregon answered in the negative, saying he would "tell them that we got carjacked" and he "[wouldn't] say anything." Defendants left in the car and Obregon went to a nearby house to seek help. Getting no response, he ran to a Circle K store a half block away. Police and paramedics soon arrived and treated Garcia, who had bullet holes in her breasts

and chin.  Garcia survived, but the incident changed her personality.  She became frightened of "everybody and everything."

### e.  Victim Impact Evidence

Maria de Los Angeles Calvo, the mother of victim George Flores, testified he was the youngest of her four children.  He was happy and friendly, much loved by family and friends, and enjoyed baseball and family gatherings.  He wanted to study electronics.  Attending George's funeral was the saddest, most difficult thing she ever had to do.  Many things continued to remind her of him.  George's own son repeatedly asked her why his father was gone.  Michelle Gerena, a close friend, described learning of George's death.  She testified that George "was the kind of person you could call at [two] o'clock in the morning.  If you needed him, he'd get out of bed for you" and "do whatever" was needed.  He loved his son and wanted everyone to be happy.  His friends continually remember and think about him.

Vivian Gonzales described her son, John Diaz, as a loving and caring man.  He had a daughter and was planning to marry.  She heard the gunshots that killed her son, and his cousin came to tell her John had been shot.  She saw her son lying on the grass, dying.  She wanted to go to him and hold him but could not bear to watch him die.  Attending his funeral was heartbreaking.  Because visiting his grave is too sad, she made a garden and finds comfort there in her memories of him. She no longer celebrates Christmas.  She is always angry and sometimes doesn't even want to get out of bed.

### 2. *Defense*

Neither defendant presented evidence at the penalty phase.

## II. DISCUSSION

## A. Jury Selection Issues

### 1. *Trial Court's Refusal To Ask Prospective Jurors if They Would Always Vote for Death if a Defendant Were Convicted of Multiple Murders*

Defendants contend the trial court deprived them of their right to a fair trial and impartial jury by rejecting a joint defense request that the juror questionnaire ask whether, if jurors found a defendant guilty of five murders with special circumstances, they would always vote for the death penalty. The court expressed concern that the question as phrased would cause prospective jurors to prejudge the evidence. It suggested asking, "If you found a defendant guilty of five murders, would you always vote for death and refuse to consider mitigating circumstances (his background, etc.)?" The prosecutor and counsel for Flores agreed to the modification. Counsel for Amezcua did not object, and the question was included.

Defendants acknowledge the trial court's wide latitude in conducting voir dire, including in the choice and format of questions to be asked. (*People v. Landry* (2016) 2 Cal.5th 52, 83; Code Civ. Proc., § 223.) Preliminarily, they forfeited this claim when neither objected to the court's modification. (*People v. Thompson* (2010) 49 Cal.4th 79, 97; *People v. Robinson* (2005) 37 Cal.4th 592, 617.) Were the claim preserved, it would lack merit.

In *Morgan v. Illinois* (1992) 504 U.S. 719, the high court recognized that "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." (*Id.* at p. 729.) Prospective jurors are unqualified if their views would prevent or substantially impair their performance in accordance with the instructions and oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) Inadequate voir dire prevents the trial court from removing prospective jurors who will not follow the court's instructions. (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188.)

The original defense question sought to identify jurors who would always vote to impose the death sentence if they convicted defendants of five murders. Defendants cite *People v. Cash* (2002) 28 Cal.4th 703, which held the trial court erred in prohibiting voir dire about Cash's prior murder, "a fact likely to be of great significance to prospective jurors" and one that "could cause some jurors invariably to vote for the death penalty." (*Id.* at p. 721.) Here, defendants reason, the trial court's reframing of the question to include reference to mitigating evidence "blurred the call of the original question in a way that suggested that only evidence of mitigating circumstances would suffice to prevent a death verdict."

The argument fails. The modification eliminated a reference to special circumstances, which the court was concerned prospective jurors would not understand. It asked whether the juror would refuse to consider mitigating evidence. Such an inquiry is generally relevant to uncovering prejudgment of penalty in a case involving multiple murder. The modified question did not ask how a panelist might react if the defense presented no mitigating evidence. But the court had no indication that the defense would ultimately make that

choice, nor did counsel request the question be modified. Further, defense counsel had the opportunity to orally question prospective jurors. Defendants point to no instance in which the court restricted such inquiry, undermining their ability to discern whether a juror could or would not follow the law. The voir dire process as a whole sufficed to identify unqualified jurors. Defendants are correct in asserting broadly that the absence of a mitigating factor may not be considered an aggravating factor (*People v. Siripongs* (1988) 45 Cal.3d 548, 583) and that the aggravating evidence in a given case may still fail to warrant the death penalty, even in the absence of mitigation. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1061–1062.) They do not persuasively suggest how the modified question might reasonably have been understood to imply the contrary.

### 2. *Excusal of Prospective Juror for Cause*

Defendants contend that the trial court erroneously excused a prospective juror who expressed reservations about the death penalty but said she could vote for death if the aggravating evidence were strong enough. The error, they claim, violated their rights to a fair trial, an impartial jury, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

### a. *Jury Selection Procedures*

The questionnaire here included the following questions:

"Are you so strongly opposed to the death penalty that you would **always** vote for life in prison without the possibility of parole and never vote for death for a defendant convicted of first degree murder and a special circumstance?"

"Are you so strongly in favor of the death penalty you would **always** vote for death and never vote for life in prison without the possibility of parole for a defendant convicted of first degree murder and a special circumstance?"

"Are you so strongly opposed to the death penalty that you would **always** vote against death regardless of what evidence of aggravation or mitigation is presented?"

"Are you so strongly in favor of the death penalty that you would **always** vote for death regardless of what evidence of aggravation or mitigation is presented?"

"In a penalty phase, would you want to hear evidence of aggravation and mitigation?"

"In a penalty phase would you **always** vote for death, regardless of the mitigating evidence?"

"In a penalty phase would you **always** vote for life, regardless of the aggravating evidence?"

"Regardless of your views of the death penalty, would you be able to vote for death for a defendant if you believed, after hearing all the evidence, that the death penalty was appropriate?"

"Will your feelings about the death penalty impair your ability to be a fair and impartial juror in this case?"

Before voir dire examination, the court instructed, "Jurors who would never impose death cannot sit in this case. [¶] Jurors who would never impose life cannot sit on this case." The court elaborated: "Now, in my experience and that of other judges . . . people kinda break [themselves] down into four categories in a case like this. [¶] We have the category number one people. These are folks that don't believe in the

death penalty. And that's fine. Many of you said you could never impose death and I respect that decision. I am not here to try to change your mind. [¶] . . . [¶] We have a category two person. This is the person who's strongly in favor of the death penalty. He is [kind] of an eye for an eye guy who says if this person, this defendant, committed murder with special circumstances, he must die. [¶] I don't care about his personal history or background. I don't care about the mitigating evidence. Murder means he should be executed. That is a category number two person. We have some of those in this group. [¶] Then we have what I call the category three person. And this is the person who says, You know, I believe in the death penalty. I think it's appropriate for society to have a death penalty. But, you know, I know myself. And I don't think I could ever vote to put somebody to death. [¶] . . . [¶] Nothing wrong with being a category three person. . . . [¶] . . . The category four person is the person who says, you know, I can go either way. I want to hear it all. . . . Many of you said I want to hear everything that I am entitled to hear before I have to make such a decision. But many of you said I could make such a decision. And that's all we're after. We want people that can make the decision." The court asked all prospective jurors to say which category they belonged in.

Prospective Juror No. 74 wrote in her questionnaire that she had "no opinion one way or the other" about the death penalty, but "I just don't want to be the one to decide; I wouldn't choose to kill someone." She had never held a different opinion on the question. When asked in the questionnaire "Are you so strongly opposed to the death penalty that you would **always** vote for life in prison without the possibility of parole and never vote for death for a

defendant convicted of first degree murder and a special circumstance?" she answered, "Yes." But in response to the question "Are you so strongly opposed to the death penalty that you would **always** vote against death regardless of what evidence of aggravation or mitigation is presented?" she answered, "Unsure." When asked, "In a penalty phase would you **always** vote for life, regardless of the aggravating evidence?" she answered, "Probably." But when asked, "Regardless of your views on the death penalty, would you be able to vote for death for a defendant if you believed, after hearing all the evidence, that the death penalty was appropriate?" she answered, "[I]f I thought it appropriate, yes." Asked whether her feelings about the death penalty would impair her ability to be fair and impartial, she answered in the negative. And when asked, "Would you like to serve on this jury?" she answered in the negative, stating in part, "Don't want to decide if defendants should die if it comes to that."

During questioning by the trial court, Prospective Juror No. 74 initially categorized herself as "pretty much a three," but said, "It would have to be for me to put someone to death, the aggravating evidence be a lot and there would be like no mitigating evidence. So it's a good chance that I am a three." The court asked, "Well, but are you saying that you could put somebody to death?" Prospective Juror No. 74 replied, "It would have to be really harsh circumstances." The court said, "That is all right. It's up to the People to persuade you. [¶] I am saying that number threes are people who say, Judge, I know myself, I could never, regardless of what the evidence was, put somebody to death. [¶] Are you that person?" Again, she equivocated: "Well, I could be a four with three tendencies." The court replied, "Yes, and we're not allowing

that this morning. No four with three tendencies. But I understand what you are saying. [¶] So are you a three or a four? [¶] You sound like you are a four?" She answered: "I could be a four."

During questioning by counsel for Flores, Prospective Juror No. 74 acknowledged that in the penalty phase she would lean toward life instead of death, "but if I thought the aggravating was enough, then you know it would be hard, but I could make the decision." The prosecutor then vividly described the reality of the penalty phase decision making process: "Let's stop. Think about it. It's not movies anymore. It is not T.V., not filling out questionnaires. It's really can you do it? To sit on this jury, you have to be able to do that if it's warranted. And this is very real stuff. . . .[¶] Is there anybody that has listened to what I've said and starting to think, whoa, wait a minute, in front of the defendants, I am going to have to come back and return a verdict of death in front of them. [¶] Maybe with their family sitting out in the audience, I have to tell a mother that her son is going to be put to death? [¶] . . . [¶] Has anybody had any kind of change of heart, any change of feeling inside of them based on what I have said at all?" Prospective Juror No. 74 raised her hand and said, "I don't think I could do it," and confirmed it was her "final determination." The court excused her for cause over defense objection.

b. *Analysis*

Both the federal and state constitutions guarantee criminal defendants the right to trial before an impartial jury. (*Duncan v. Louisiana* (1968) 391 U.S. 145, 149–150; *Turner v. Louisiana* (1965) 379 U.S. 466, 471; U.S. Const., 6th & 14th

Amends.; Cal. Const., art. I, § 16.) Prospective jurors cannot be excluded for cause simply because they voice general objections to the death penalty or express conscientious or religious scruples against its imposition. (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 522.) Prospective jurors in a capital case may be excluded for cause, however, if their views would prevent or substantially impair the performance of their duties. (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 424.) "[I]n determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.) "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10.)

Defendants contend that Prospective Juror No. 74's questionnaire responses reflected a juror without a fixed opinion regarding the death penalty, but one with concerns about herself returning a verdict that would end someone's life. In urging error, they rely on statements she made during voir dire characterizing herself, in the trial court's taxonomy, as a "category number four" juror, one who would "lean towards . . . [life] instead of death," but could vote for death, even though "it would be hard," if she "thought the aggravating was

enough."[9]  They observe that it was only after the prosecutor asked whether any juror had had a change of heart and could not return a death verdict before defendants and their family that Prospective Juror No. 74 said, "I don't think I could do it." They maintain the question about defendants' family overly emotionalized the inquiry.

Prospective Juror No. 74 gave equivocal and conflicting answers throughout the process.  She obviously thought about her own views and did her best to explain them.  Her final reply to the prosecutor's question constituted substantial evidence on which the trial court could base its excusal. (*People v. Fuiava* (2012) 53 Cal.4th 622, 659–661.)  There was nothing improper in the prosecutor's request that she assess her own ability to return a death verdict in the concrete situation in which she might find herself if she served.  There was no error.

## B. Guilt Phase Issues

### 1. Courtroom Security

Defendants contend their rights to a fair trial, presentation of a defense, and the presumption of innocence were prejudiced by heightened courtroom security measures not based on case-specific reasons.  They claim the court deferred to the sheriff regarding the level of security and failed to state on the record why the need for the measures employed

---

[9]  While we do not endorse a taxonomy like the one employed in this case, we recognize that it may be a helpful starting point for determination of a prospective juror's qualification to serve, provided the court, as here, supplements it with follow-up questions.

outweighed potential prejudice to the defendants. We reject the contention.

At the start of jury selection, there were eight uniformed deputy sheriffs in the courtroom. Counsel for Amezcua objected, saying, "I think that it's onerous. I think that this is a difficult enough case without having the impression that would be left by having so many sheriff[']s deputies sitting in the courtroom throughout this trial, so I would object to the number of sheriffs that are here. [¶] My understanding is that neither of these gentlemen, Mr. Amezcua or Mr. Flores, have acted up in court and that at this point, there is no reason for that kind of a security detail to be present in front of the jury." Counsel for Flores joined in the objection. The court replied, "I normally leave security issues up to the bailiffs, to the experts. I feel that in this case, given that there have been a number of incidents at the jail, that there is understandably some concern above that present in most cases. I will watch the issue. [¶] I feel that I am going to allow the number of bailiffs to remain for today. I feel that this is going to be very quick. The jurors are going to be in and out in a matter of minutes.[10] I will give some additional thought to the number of bailiffs that are necessary, but given the fact that we have two defendants, we have had a number of incidents at the jail, I think it's important for us to have what the security people call a show of force. [¶] My thought is that once we get going with the trial, and I do expect that there will be no problems. I think that

---

**10** The day's session included introductions, distribution of questionnaires, preinstructions, and some hardship excusals, but no voir dire.

Mr. Amezcua and Mr. Flores have conducted themselves in a very appropriate manner at all times with this court, and I think that once we get going, that the sheriff will see that there is probably not the need to have such a number of bailiffs, but your objection is noted for the record."

Counsel for Amezcua noted that both defendants were belted to their chairs with one hand cuffed to their belt, and expressed doubt that either defendant could even stand up. The court observed that the defense table had been draped to prevent prospective jurors from seeing defendants' cuffed hands. Counsel for Flores objected, arguing that jurors would be able to infer that defendants were shackled from the fact only their left hands would be above the table. The court overruled the objection, noting that precautions had to be taken in this case. Shortly thereafter prospective jurors entered the courtroom. The record does not reflect whether these security arrangements were maintained during the rest of the proceedings. The defense made no further objections on this topic.

"We begin with the familiar principle that a 'trial court has broad power to maintain courtroom security and orderly proceedings. [Citations.]' [Citation.] For this reason, decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion. [Citations.] [¶] However, despite our traditional deference to the trial court in this area, some extraordinary security practices carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial. These exceptional practices must be justified by a particularized showing of manifest need sufficient to overcome the substantial risk of prejudice they pose. For example, visible physical restraints like handcuffs or leg irons may erode

27

the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] . . . In addition to their prejudicial effect on the jury, shackles may distract or embarrass a defendant, potentially impairing his ability to participate in his defense or serve as a competent witness on his own behalf. [Citations.] . . . [¶] Because physical restraints carry such risks, the United States Supreme Court has long considered their use inherently prejudicial. [Citations.] Thus, a criminal defendant may not appear before the jury in shackles unless the trial court has found that the restraints are justified by a state interest specific to the particular trial. [Citation.] . . . [¶] . . . [¶] But the stringent showing required for physical restraints like shackles is the exception, not the rule. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need. [Citations.] In contrast to physical restraints placed on the defendant's person, we have upheld most other security practices when based on proper exercises of discretion. . . . [Citations.] . . . [W]e have consistently upheld the stationing of security or law enforcement officers in the courtroom." (*People v. Stevens* (2009) 47 Cal.4th 625, 632–634.)

In *Holbrook v. Flynn* (1986) 475 U.S. 560, Justice Marshall explained why different rules apply to physical restraints and the deployment of security personnel. "The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a

defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. . . . Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." (*Id.* at p. 569.)

Defendants contend the trial court abused its discretion by deferring to the sheriff's determination that eight uniformed officers were needed to secure the courtroom in this trial instead of justifying the practice by reference to case-specific facts. The contention is not borne out by the record. In overruling defendants' objection to the presence of eight bailiffs at the outset of the trial, the court alluded to the many incidents in which Amezcua and Flores were involved in violent or nonconforming conduct in jail. Both were categorized as "K-10," or "high security and/or administrative segregated, noteworthy cases." In an earlier hearing to determine whether defendants would be allowed to possess writing implements in their cells, evidence demonstrated the following: (1) An October 2, 2000 search of Flores's cell yielded a five-foot long wooden broom handle, a large piece of jagged mirror, two altered razors, and excessive linens, all contraband. (2) On November 2, 2001, both defendants, along with others, were being removed from their cells for visits. Defendants managed to slip out of their handcuffs and waist chains and stabbed inmate Steve Matson with a homemade shank. (3) On September 2, 2001, Amezcua was outside his cell cleaning up the tier entrance. He assaulted inmate Steve Harvey by stabbing him through the bars of his cell. (4) On May 10, 2001, Flores became belligerent and threatened

Deputy Cikcel with the words, "You'll see — maybe not today, but you'll see it when you're not expecting it." (5) An April 30, 2001 search of Flores's cell uncovered excessive linen and two pieces of metal capable of being fashioned into shanks. The metal pieces were 12 and eight inches long. (6) A January 29, 2001 search of Amezcua's cell revealed a five-and-a-half-inch-long shank with a cloth handle. (7) On January 5, 2001, Flores initially refused to leave his cell. After he did so, deputies found a tattoo kit, several pieces of carbon paper (commonly used in tattooing), loose razor blades, and a pair of orange jail pants that had been cut off into shorts. Subsequent searches of defendants' cells yielded pencils, which defendants were not permitted to possess because of their potential use as stabbing weapons. At another hearing on jail security matters, Deputy John Kepley testified that on April 20, 2002, Amezcua's cell contained a pencil and a quantity of jail-made alcohol. Kepley testified to six incidents between November 2001 and September 2002 in which Flores was either insubordinate and noncompliant with jail staff or was found to possess contraband or weapons in his cell.

The trial court did not improperly substitute the bailiffs' discretion for its own determination regarding the necessary level of courtroom security. The court's comments reflect its permissible consideration of the bailiffs' views, as well as its own assessment that the case presented security concerns above those present in most cases and its sense that a "show of force" was appropriate. The court did not abdicate its authority over courtroom security.

Defendants argue that because the enumerated incidents occurred several years before the start of trial and none reflected courtroom misbehavior, they fail to support the

court's ruling. They point out that the judge described their conduct during court proceedings as "very appropriate." But it is settled law that a defendant's violent custodial behavior can support a court's exercise of discretion to order extra courtroom security. (See, e.g., *People v. Lomax* (2010) 49 Cal.4th 530, 559–562; *People v. Hawkins* (1995) 10 Cal.4th 920, 944.) Nothing in the record compels an inference that the conditions initially giving rise to the need for extra security had abated by the time of trial. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390–392.) Finally, during a hearing after the court's November 2, 2002 ruling, Amezcua said in court that he wished he had a gun, simulated a gun with his hand, pointed his finger at the prosecutor, and made a "shooting noise." Defendants characterize the incident as "mere macho posturing," but the trial court could properly consider the conduct in a less benign light and take it into account in approving these security arrangements.

The cited incidents of violent or nonconforming custodial behavior are likewise a particularized showing of manifest need for physical restraints. There was no abuse of discretion in the trial court's shackling order. (*People v. Stevens*, *supra*, 47 Cal.4th at p. 632; *People v. Duran* (1976) 16 Cal.3d 282, 293, fn. 12.)

Even if defendants could establish an abuse of discretion, the record fails to reflect any prejudice, defendants' generic assertions to the contrary notwithstanding. (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746; *People v. Watson* (1956) 46 Cal.2d 818, 837.) The assertions that the jury noticed limitations on defendants' freedom of movement or inferred the court viewed defendants as a threat are mere speculation unsupported by any affirmative indications in the record. (See

*People v. Ervine* (2009) 47 Cal.4th 745, 773; *People v. Cleveland* (2004) 32 Cal.4th 704, 740.)  Nor do defendants point to anything in the record affirmatively suggesting that the restraints had any effect on their ability to conduct their defense.  " '[W]e have consistently held that courtroom shackling, even if error, [is] harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1259.)  Moreover, the trial court expressed confidence that once the trial was under way there would be no problems and the need for such a number of deputies would abate.  The record does not reveal whether the court's prediction was borne out, but defendants did not renew their objection.

### 2. Admission of Autopsy Results

Defendants were convicted of the first degree murder of Arturo Madrigal during a drive-by shooting for the benefit of a criminal street gang.  (§§ 187, subd. (a), 190.2, subd. (a)(21), 186.22, subd. (b)(1).)  A deputy medical examiner other than the one who performed the autopsy testified as to the results.  Defendants assert the testimony violated their right of confrontation under the Sixth Amendment.

Madrigal was shot and killed on May 25, 2000.  Two days later, Dr. Carrillo performed an autopsy, and wrote a report concluding that Madrigal died from a homicidal gunshot.  Dr. Carrillo was away from the office during trial because his wife had just had a baby.  In his stead the prosecutor called Dr. Lisa Scheinin, a medical examiner in the same office.  Dr. Scheinin described Dr. Carrillo's observations and conclusions about wounds and the trajectory of the fatal bullet,

as recorded in his autopsy report. The report itself was not admitted into evidence.

Defendants did not object to Dr. Scheinin's testimony, thus failing to preserve the claim in this post-*Crawford* case. (See *Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).)[11] Defendants establish no ground for relief because admission of the testimony, even if error, was harmless beyond a reasonable doubt.

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford, supra*, 541 U.S. at p. 42.) *Crawford* held that the clause bars introduction of "testimonial" hearsay against a defendant unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (*Id.* at p. 68; see also *id.* at p. 42.) Subsequent decisions by the high court and this court have sought to clarify what a "testimonial" statement is in the context of written reports documenting scientific testing. (See *Melendez-Diaz v. Massachusetts* (2009)

---

[11] Defendants contend that the omission was ineffective assistance of counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [ineffective assistance entails deficient performance resulting in prejudice].) Not so. Defendants fail to overcome the presumption that the lack of objection was sound trial strategy. (*Id.* at p. 689.) The autopsy results were unimportant given the other evidence that Madrigal died of a gunshot wound to the head, and an objection would only have called attention to this routine evidence with little prospect of gain, as Dr. Carrillo could well have been made available to testify. In any event, as discussed in the opinion text, admission of the autopsy findings resulted in no prejudice.

557 U.S. 305, 310–311; *Bullcoming v. New Mexico* (2011) 564 U.S. 647, 664–665; *Williams v. Illinois* (2012) 567 U.S. 50, 57–58; *id.* at pp. 103–104 (conc. opn. of Thomas, J.); *People v. Dungo* (2012) 55 Cal.4th 608.) A comprehensive definition of the term "testimonial" awaits articulation. (*Dungo*, at pp. 648–649 (dis. opn. of Corrigan, J.).)

However, we need not address the question in depth because any error here was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The cause of Madrigal's death was undisputed. Defendants acknowledged their responsibility in pretrial statements. Flores admitted he "domed" Madrigal and shot him in the face. A responding officer testified he saw Madrigal inside the Blazer with blood coming from his ears and head. Photographic evidence corroborated the testimony. Extensive evidence demonstrated that Madrigal died as the result of a gunshot wound to the head.[12] Defendants contend the improperly admitted autopsy results supplied necessary corroboration, for purposes of the corpus delicti rule,[13] of

---

[12] The same reasoning obviates any need to discuss *People v. Sanchez* (2016) 63 Cal.4th 665, 686, as it may apply here.

[13] "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself — i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 [holding that the truth in evidence provision of Proposition 8 did not eliminate the independent-proof rule insofar as it prohibits conviction absent evidence of the crime independent of the defendant's out-of-court statements].) " 'The independent proof may be by circumstantial evidence

Flores's confession that he "domed" Madrigal. The contention lacks merit. The responding officer's testimony and the photographic evidence provided ample corroboration.

### 3. *Admission of Statements Made to Deputy District Attorney Levine*

On January 7, 2002, the trial court granted defendants' requests to represent themselves. (See *Faretta v. California* (1975) 422 U.S. 806.) They continued to represent themselves until May 6, 2002, when the court allowed them to revoke their *Faretta* requests. Both were represented by counsel for the remainder of the proceedings. In February 2002, trial prosecutor Darren Levine met with defendants, at their request, to provide discovery. In an unrecorded conversation, defendants made spontaneous statements about the charged crimes and other offenses. Levine and a law enforcement officer met with them again on February 21, 2002. A third meeting took place on March 28, 2002, with investigator Thomas Kerfoot in attendance. Levine surreptitiously recorded the February 21 and March 28 conversations. In the interval between the two conversations, a preliminary hearing was held in connection with the Santa Monica pier charges. Following an expanded investigation, Levine convened a grand jury. It indicted defendants for the murders of John Diaz and Arturo Madrigal and the attempted murders of Paul Gonzales

---

[citation], and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient. [Citations.]' [Citation.] It is not necessary for the independent evidence to establish that the defendant was the perpetrator." (*People v. Wright* (1990) 52 Cal.3d 367, 404.)

and Fernando Gutierrez, with numerous weapons, gang, and special circumstance allegations. The indictments were later folded into the amended information on which the case went to trial. The trial court denied defense motions to exclude redacted recordings of the statements. Defendants were convicted of the offenses against Diaz, Madrigal, and Gutierrez.

Defendants contend that the statements should have been excluded under Penal Code section 1192.4 and Evidence Code section 1153 because they were part of settlement negotiations. Their suppression motion below did not assert this ground. Instead the defense relied on three other grounds not renewed here. Their appellate claim is thus forfeited. (Evid. Code, § 353, subd. (a).) It also lacks merit.[14]

Evidence Code section 1153 provides that "[e]vidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible in any action or

---

[14] Defendants contend that because they were "unrepresented" during the conversations, prosecutor Levine should be held to a "higher standard," and should have advised defendants of the exclusionary rule regarding statements made in the context of settlement negotiations. Under this "higher standard" defendants should not be held to have forfeited review. Setting aside the questionable assumption that a prosecutor has an obligation to provide legal advice to defendants who have exercised their *Faretta* rights, the contention is unavailing; defendants had given up their pro per status more than a year before their appointed counsel moved to suppress the February 21 and March 28 statements. We review the claim based on the actions and decisions by counsel in pursuing their objections.

in any proceeding of any nature, including proceedings before agencies, commissions, boards, and tribunals." Penal Code section 1192.4 provides that "[i]f the defendant's plea of guilty pursuant to Section 1192.1 [plea of guilty specifying degree of crime] or 1192.2 [plea before committing magistrate] is not accepted by the prosecuting attorney and approved by the court, the plea shall be deemed withdrawn and the defendant may then enter such plea or pleas as would otherwise have been available. The plea so withdrawn may not be received in evidence in any criminal, civil, or special action or proceeding of any nature, including proceedings before agencies, commissions, boards, and tribunals." In the enactment of these sections the Legislature extended the earlier rule from civil cases to prohibit evidence of offers to compromise. (*People v. Wilson* (1963) 60 Cal.2d 139, 156; see former Code Civ. Proc., § 2078.) At least one case has extended the exclusionary rule to admissions made in the course of plea negotiations. (*People v. Tanner* (1975) 45 Cal.App.3d 345, 349–351.)

We assume without deciding that the rule extends to mere admissions made during plea negotiations, as opposed to withdrawn pleas or offers to plead. Even so, defendants' statements do not fall under section 1192.4 because they were not made in the course of any plea negotiations. Settlement of the case was never on the table. Defendants were seeking to take credit for several uncharged murders and other crimes they had committed so that they could be tried, convicted, and sent to death row. They asked only that the prosecutor exert efforts to see they received the minimum restitution fine. They did not condition their admissions on any such agreement.

It is true, as defendants observe, that the subject of a non-life sentence arose during the February 21 conversation. After

37

discussing discovery and the upcoming preliminary examination, Flores alluded to an offense (the Diaz killing) that law enforcement evidently had not yet tied to defendants. Prosecutor Levine asked defendants, "Why do you want me to make all these murders on you?  I don't get it."  Flores replied, "Because I enjoy staying here . . . ."  Levine went on jocularly: "You don't have a thing for me or anything?"  Flores responded, "Nah, nah, we just — we think you're cool, you know.  And then after the trial we'll give you another one."  Levine asked, "You can give me another murder that you did?"  Flores replied, "Another one."  Levine asked why.  Flores answered, "Why not?"  Evidently testing their sincerity, Levine reminded defendants of an earlier conversation:  "When you came to me — remember last time you said to me 'give me — give me the 50 years.'  [¶] . . . [¶]  And without the 'L [a life sentence].' [¶] . . . [¶] I don't think you want the death penalty.  You said that."  Flores answered, "I'm gonna help.  If you give me 50 years without the 'L,' I can get married and get a bone yard visit.  [¶] . . . [¶] But if you give me the 'L,' I have no sex." Levine said he understood the point, but firmly rejected any suggestion he might be open to seeking a noncapital sentence: "[N]othing personal . . . but . . . if there's a death penalty, this is the case that — that warrants it."

After Levine's assurance that he would pursue a death sentence, defendants continued to make statements.  They shifted to diverse topics, mentioning their other criminal activities and philosophy, and a recipe for pruno [jail-made alcohol].  Eventually, Amezcua said, "Okay if we talk about these murders, right, that we did," and "Can we talk about restitution?"  Flores said, "See, that's what we wanna do. Okay, we're gonna get a lot of restitution.  We'll give you a

murder if [you] drop our restitution, so it'll only be 200 instead of a whole (*unintelligible*) of restitution, which we'll never be able to pay." Defendants explained to Levine that death row inmates have restitution deducted from their books [money that can be spent in prison]. Flores commented, "Our thing is this, see, if we buy a TV, we're gonna have to pay restitution." He elaborated: "So, now I'm going to death row, something different, something new, right? And I don't wanna have a lot of restitution because when I buy a TV, they're gonna make me pay to the victims in (*unintelligible*) or right up front."

After further discussion of defendants' criminal activities, Flores again urged a $200 restitution fine. He said they had now admitted three murders and could reveal two more. Levine asked, "[W]hy are you giving it to me? [¶] . . . [¶] And . . . that doesn't bother you that I'm gonna use that against you[?]" Amezcua replied, "We know that already." Flores said, "We don't care. The whole thing is, we want death, right?"

During the March 28 conversation, Levine observed that "a number of times in court you guys have said that you wanted us to come talk to you about some cases and maybe work out something, either with regard to, uh, restitution issue . . . ." Amezcua and Flores agreed. Both defendants confirmed they understood that "all this stuff" discussed during their conversations could be used against them; that they could have an appointed lawyer present; and that they did not have to speak with Levine. They agreed that Levine and Kerfoot were present at their request and that they wanted to speak with them. Flores's only expressed concerns were that the record be clear that each defendant incriminated himself alone and that the prosecution would not "go after" Barber or Flores's mother.

The conversation turned to a crime committed in Redlands, and Flores raised the possibility that defendants would admit to two more murders. Amezcua asked, "So how much of a guarantee can we have on the restitution though?" Levine told defendants the decision would be up to the judge, but he would use his best efforts to persuade the judge to order $200 in restitution fines. Defendants raised the fate of Katrina Barber. Levine said he would push for a state prison sentence that would allow her to be released immediately based on time already served. Defendants then described the Diaz and Madrigal murders as well as their attempts to kill Gutierrez and Gonzales.

The February 21 and March 28 conversations never involved a potential plea to any of the offenses or allegations ultimately charged in this case. Defendants' argument to the contrary relies on the reference to their earlier exploration of a 50-year non-life sentence. Levine promptly rejected that option and defendants never again alluded to it. Nonetheless they continued to disclose information about other offenses. Defendants contend that because they were seeking resolution of "aspects" of the case, specifically restitution, this court should read Evidence Code section 1153 and section 1192.4 broadly and accord them the benefit of the exclusionary rule. We decline the invitation. Defendants would not plead to a death sentence and the prosecutor would offer nothing less. The public policy embodied in section 1192.4 and Evidence Code section 1153, which favors "the settlement of criminal cases without the necessity of a trial" (*People v. Wilson, supra*, 60 Cal.2d at p. 156), would not have been furthered by exclusion of statements made here. Their admission was not improper. At no point in any of the conversations did either

defendant actually make, or engage in negotiations that would have led to their making, "an offer *to plead guilty* to the crime charged or to any other crime," as provided in Evidence Code section 1153. (Italics added.) Their revelations of guilt for other, uncharged crimes to reduce their obligations to pay restitution and maximize their in-prison spending ability do not bring them within the statute.

### 4. CALJIC No. 3.00

Defendants contend the trial court erred in giving the jury former CALJIC No. 3.00, which told them that each principal involved in the commission of the crime, whether as a direct perpetrator or an aider and abettor, is "equally guilty" of the offense. Neither Amezcua nor Flores objected or requested any modification of the standard language. Nonetheless, section 1259 allows us to reach the merits of any claim of instructional error that potentially affects a party's substantial rights. (*People v. Johnson* (2016) 62 Cal.4th 600, 639.) Defendants each assert error as to different convictions.

Amezcua raises the CALJIC No. 3.00 issue in connection with his conviction as an aider and abettor in the Diaz and Madrigal murders and the attempted murder of Fernando Gutierrez during the Madrigal killing. As noted, Flores was the actual killer in those instances. Diaz was killed by nine-millimeter gunfire while riding on the handlebars of a bicycle pedaled by Paul Gonzales. Gonzales identified Flores as the shooting passenger in a black SUV that made two U-turns to drive past the bike. He did not identify the driver. The prosecution introduced Flores's extrajudicial admission that while being driven by Amezcua, Flores fired five shots from a nine-millimeter weapon, killing a man riding on bicycle

handlebars. Hearing this admission, Amezcua laughed and said to the prosecutor, "Catch me?" The prosecution also introduced admissions of Flores that he was the shooter and Amezcua the driver of a "four-runner" when Flores shot a man in the mouth.

As to the Madrigal killing, evidence showed the victim was parking his Chevrolet Blazer when a car stopped alongside and someone yelled, "Where you from?" Madrigal's passenger, Gutierrez, said, "We're not from nowhere." Gutierrez told police there were four Hispanic men with shaved heads in the car and the passenger shot Madrigal. The fatal bullet was a nine-millimeter. During discussions with the prosecutor, defendants spoke of a shooting involving a Blazer. Flores said he shot the driver in the face and neck, and that the passenger ran. Amezcua agreed. Asked the reason for the shooting, Amezcua said, "He was a gang member, man," and described the act as "a vandal type of thing. You're driving around your neighborhood looking for people to kill."

Flores raises the CALJIC No. 3.00 issue in connection with his conviction of the George Flores and Reyes murders, in which Amezcua was the actual killer. Briefly, the prosecution's evidence at trial showed that defendant Flores was riding in a stolen Toyota driven by Katrina Barber. Defendant Amezcua rode in a Monte Carlo driven by fellow ESBP member Luis Reyes. The cars passed a Ledford Street residence where George Flores and several friends were socializing outside. The Toyota and Monte Carlo turned around and came toward the home. Amezcua got out of the Monte Carlo, exchanged words with George Flores, and pointed a gun at him. Shots were fired; Flores was killed; and Joe Mayorquin was wounded. The two cars drove off. Because the

Toyota was experiencing engine trouble, Barber pulled off the freeway and saw Amezcua shoot Reyes. Flores asked Amezcua, "What are you doing that here for?" The men partially dragged Reyes from the Monte Carlo. Even though his right leg remained in the car, Flores told Barber to drive away and "[j]ust run [Reyes] over."

Defendants correctly observe that, contrary to a possible implication of former CALJIC No. 3.00, an actual killer and an aider/abettor are not always guilty of the same offense. Rather, in a homicide prosecution not involving felony murder or the natural and probable consequences doctrine, the aider/abettor's guilt is based on the combined acts of all the principals and on the aider/abettor's own knowledge and intent. Consequently, in some circumstances an aider/abettor may be culpable for a greater or lesser crime than the actual killer. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120.) *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th 335 recognized that the standard instruction "generally stated a correct rule of law," in that "[a]ll principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*Id.* at p. 433.) However, former CALJIC No. 3.00 "could be misleading if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding." (*Ibid.*)

Here the prosecution sought to prove murder under theories of premeditation, lying in wait, and drive-by shooting. Defendants contend that as to each theory, the evidence did not clearly show that the aider/abettor shared the direct perpetrator's mens rea. Consequently, the unmodified CALJIC No. 3.00 could potentially have misled the jury into convicting

the aider/abettor without making the requisite factual findings. The contention is unpersuasive.

Because the circumstances of this case reflected the defendants' joint participation in the offenses at issue with the required intent to kill, the trial court did not err in giving the jury the unmodified CALJIC No. 3.00. Neither the evidence nor any theory of defense argued at trial or cited in the briefs suggested that Amezcua and Flores entertained different states of mind rendering them guilty of different crimes. In relevant portions of statements to the prosecutor, both defendants admitted to the Diaz and Madrigal killings. Flores explained that the motivation for those offenses was "territorial" and that, by committing them, they were trying to instill fear in other gangs. The attempted murder of Fernando Gutierrez in the same incident as the Madrigal killing is indistinguishable in the relevant respect. The Mayorquin and George Flores murders fit a similar pattern of a shooting done for gang-related purposes and can be analyzed similarly for purposes of the current claim of error. The Luis Reyes murder was factually a bit different. Reyes was a fellow member of ESBP, defendants' own gang. Flores did ask Amezcua "[w]hat are you doing that here for?" But almost immediately thereafter Flores urged Katrina Barber to "run [Reyes] over" with the Monte Carlo, evidencing his own intent to kill Reyes. Reyes was still alive when defendants left the scene. The evidence thus amply supported an inference that defendants shared the same intent with respect to each of the charges, and for that reason no modification of the instruction was warranted.

Other instructions, moreover, reinforced the requirement that the jury find the intent-to-kill element proven in order to

convict of murder or attempted murder on a theory of aiding and abetting. CALJIC No. 3.01, as given in this case, provided that "[a] person aids and abets the commission of a crime when he or she: [¶] (1) with knowledge of the unlawful purpose of the perpetrator, and [¶] (2) with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) by act or advice aids, promotes, encourages or instigates the commission of the crime." The requirement that the aider/abettor know of the perpetrator's unlawful purpose, intend to facilitate that purpose, and do an act that assists or facilitates the purpose, sufficiently explained the required mens rea. CALJIC No. 17.00, also given here, requires the jury to decide each defendant's guilt separately.

### 5. *Prosecutorial Misconduct in Inviting Jury to View the Case through the Victims' Eyes*

Defendants contend prosecutorial misconduct deprived them of due process and a fair trial. They assert that the prosecutor made an improper appeal to jurors' sympathy for the victims during guilt phase closing argument. The prosecutor expressed concern that jurors would find themselves benumbed by the evidence of so many murders, arguing: "My concern, and I will just tell you right now here my concern is okay, you see one murder. You look at that, wow. You see two murders, wow. [¶] Three, wow. [¶] Four, then the fifth murder you see and you start to think, wow, people really do this. This isn't a movie. This is not a movie. This is not a television show, but what worries me is over time, you can get what? More pictures you look at it, the more you can get numb to it." The prosecutor reminded the jurors to "remember what justice is." He continued: "Remember what it must have been like to be one of their victims being shot and

choking and trying to get your last breath out while your blood is gurgling in your lungs. What it must be like to be one of those people." Turning to Amezcua's actions on the Santa Monica Pier, specifically the assault on Jing Huali, the prosecutor said: "What do we know? Jing Huali, while she was laying down, the defendant shot her. An assault with a firearm. I point a loaded gun at your head, the assault is complete. That's it; it's done. You do not have to fire. [¶] I put my left arm around and I put a gun to your head, a loaded gun, completed, done, proven. I bet you would feel assaulted if someone had a loaded gun pointed at your head. [¶] She was shot."

Preliminarily, defendants failed to object to the prosecutor's remarks and did not request a jury admonition. Consequently, they forfeited their misconduct claims. (*People v. Hinton* (2006) 37 Cal.4th 839, 863.) Defendants seek excusal of forfeiture on the ground that an admonition would not have cured the harm. In the alternative, they contend trial counsel rendered ineffective assistance in failing to make a timely objection.

Were this court to reach the merits of the claim, it would appear the argument crossed the line of impropriety. "The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

Although a prosecutor may vigorously argue the case, appeals to sympathy for the victim during an objective determination of guilt fall outside the bounds of vigorous argument. (*People v. Pearson* (2013) 56 Cal.4th 393, 441; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057; *People v. Fields* (1983) 35 Cal.3d 329, 362–363.) Here, as in *Stansbury* and *Fields*, by inviting jurors to view the crime through the victims' eyes, the prosecutor made an improper appeal to emotion and sympathy.

The remarks here constituted but a brief part of the argument, however, and the evidence of defendants' guilt, including their own admissions, was overwhelming. Accordingly, there is no reasonable probability the impropriety affected the guilt verdicts. (*People v. Pearson, supra*, 56 Cal.4th at pp. 441–442; *People v. Stansbury, supra*, 4 Cal.4th at p. 1057.) Based on that want of prejudice, defendants' claim of ineffective assistance of counsel in failing to object to the remarks lacks merit. Nor, contrary to Flores's claim, did the remarks prejudice defendants at the penalty phase, where " 'considerable leeway is given for emotional appeal so long as it relates to relevant considerations.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 551.) The terror defendants inflicted on victims and their callousness in doing so are legitimate factors for consideration.

### C. Penalty Phase Issues

#### 1. *Trial Court's Acquiescence in Defendants' Refusal To Allow Their Counsel To Present Penalty Phase Defense*

The day before closing guilt phase arguments, defendants and their four counsel asked to meet with the court in camera. A transcript of the closed hearing covers 24 pages. Counsel told the court that each client had informed them repeatedly

and emphatically that they did not want any defense presented should there be a penalty phase. We summarize that hearing in some detail.

Counsel for Amezcua reported that "throughout my representation," his client instructed that he did not want his family called as witnesses. He "has expanded that now . . . he does not wish me to put on any defense, any witness in the course of the penalty phase." Amezcua agreed that counsel could prepare for the penalty phase, which he did. Counsel explained the "nature of the penalty presentation" and told his client that any chance for a life sentence would be "diminished if not completely eliminated by the failure to present any mitigating evidence." Amezcua told his lawyer that he understood, and his counsel believed he did so. Counsel asked to bring the matter to the court's attention, give the court a chance to inquire, and "give Mr. Amezcua an opportunity to refute anything I am saying."

The court asked if it should discuss the situation with each defendant separately. Counsel related both defendants and their lawyers had discussed the question together in the last day or two and that both defendants wished to confer with the court together.

Counsel for Flores reported that his client had the same intention. Counsel had reviewed the penalty-phase evidence he had prepared and had "explained it all to him." "I have told him we have a much better chance of avoiding the death penalty" by presenting mitigating evidence. Counsel had three family members and three experts prepared to set out nine

points in mitigation.[15]  After that explanation, Flores had said, " 'No, I don't want that.  I don't want my parents involved.  I want no witnesses on my behalf.  Period.' "

The court asked Amezcua's counsel to summarize the mitigating evidence he was prepared to introduce.  Counsel replied his presentation would be "somewhat along the same lines."  He had seven to 10 family members available to testify, along with a psychologist and a social historian.  He would offer a three-hour tape recording of the hostage negotiations which would reveal a different and "much softer side" of Amezcua.

The court explained to both defendants that it wanted "to make sure that it is very clear as to what [each] defendant wants" and said it would ask both of them "what it is you really want here."  "It's also important for me to establish that your decision is knowing and voluntarily made."

It went on to explain, "I am also charged with the responsibility of trying to persuade one or both of you to change your mind, to encourage you to consult further with your attorney before making any final decision."  The court told defendants that "a decision not to put on mitigating evidence could result in a verdict of death" and would "not be a basis for a reversal of that verdict."  The judge was going to talk first with defendants together, and then separately, "just to make

---

[15]  Testimony would address parental criminality, drug abuse, rejection, and neglect; family instability and poverty; Flores's exposure to domestic abuse; and his asserted learning disabilities and head injuries.  An expert would also describe conditions of incarceration.

sure that one is not influencing the other." The court heard from Flores first.

Flores repeated that he understood the jury might decide a death sentence was too harsh for him, "but I refuse to allow my attorneys to attempt to sway their opinion." The court asked why. Flores replied: "I do not want my attorneys to . . . put my family and friends or whoever on there and make it — blame them for something I may have done." "I did it without them. In my mind I stand alone. . . ." "[I] am very adamant about it — will not allow anybody, nobody to get them on the stand." Asked when he made this decision, Flores replied, "2000, Fourth of July," the day, five years earlier, when he had been arrested. When the court observed, "You've been thinking about it for quite a while," Flores confirmed, "Yes."

Turning to Amezcua, the court asked: "Tell me in your own words what it is you are thinking." Amezcua replied: "I don't want nobody up there crying on my behalf, when I didn't think about them when I was out there. . . . I care about them but that's my own personal thing." Told by the court that he "might very well get the death penalty," Amezcua replied: "I fully understand; right?" "Mr. Perlo and Mr. Miller [his counsel] have a done a great job in defending me. . . . [¶] I talked to them and his investigators, whoever, right? And, to tell you the truth, I feel bad for not letting him do his job to the extent I hog-tied him the whole way. . . . If he would have done that, I would have gone pro per."

Returning to defendant Flores, the court asked if he had any questions about what mitigating evidence was available. It reminded him that "your counsel have worked hard and have developed evidence they would like to present. You

understand that?" Flores responded: "Oh, yeah," and added, "[T]hey did a great job in that."

The court told Amezcua: "You understand that your counsel have put together some information, a lot of information." He replied: "I just want really to absolve him from any lack of effort on his behalf. . . . It's been my choice from way before, I mean, I ever got arrested. I understood my actions would get me to this point in life way before I ever got arrested."

The court asked both defendants if they had heard of the phrase "suicide by cop," and each confirmed he had. The court said, "[M]y fear is that's kind of what you guys are doing here." Flores rejected the notion: "I understand your feeling. I understand what you are saying. . . . But my thing is I feel if I do get death, more than likely I will die on death row by natural causes of old age. . . . I mean there is 640 people before me — actually 639 because one just got a reversal."

Asked if he intended "suicide by cop," Amezcua responded, "No, because I will tell you the reason why it's not. Because the day that I got arrested I had three choices: Either take my own life, get arrested, or either let them do it themselves. And I knew by me taking my life was a coward way out." He wanted to give his family "an opportunity to say good-bye to me and I say good-bye to them, also, and let them understand that it's not their fault, because they blame themselves."

Flores elaborated: "I don't want to die. If I want to die where I'm at, I'd kill myself. . . . But my thing is if I do go to death row, I am going to get a way better appeal action. . . . And if I go to death row, I believe there's some technicalities in

my case that maybe one day with [a lawyer's] assistance with little words or something, that they will get me back out, and I may be old, but I believe I will be back in a level four one."[16]

The court asked if their decision was based on concerns for their safety in prison. Amezcua said: "Never been." Flores: "No, never." The court then said: "And you both understand that if you get a death verdict, you know that this is not going to be a grounds for reversal." Flores responded they were "giving that piece only up," but that all other grounds for appeal were open. The court reminded them that they had the right to testify and ask the jury to impose a death sentence. It clarified that it was not encouraging them to do so and would, in fact, discourage it. It did want to make sure they were aware of their right to testify, "just like you have the right to testify in the guilt phase."

The court ended the discussion by saying: "The main thing is to say this: You are in control of the evidence that is offered at a penalty phase; okay? [¶] You seem to know that already, but that is the law. And even though [defense counsel] have prepared and want to put on the mitigating evidence and they want to argue to the jury that you should not get the death penalty, you are the controlling person and you can say 'no, I don't want you to put that evidence on.' "

The court began the separate conversations with Flores and his counsel. It noted that the prosecutor had said Flores could have been a lawyer and the court said it had been impressed with his intelligence. It complimented him on his

---

[16] Level four refers to the inmate classification housing system, a level at which Flores had been held before.

affection for reading and mentioned two books by a defense lawyer describing his courtroom work. It reminded him that, even if he were incarcerated for life he could help other inmates and do other worthwhile things in prison. It urged Flores to think more about his decision while the jury was deliberating on guilt. It reminded him that the presentation of mitigating evidence might make a big difference. The court asked Flores whether he had any questions.

Flores said he understood the court was fulfilling its obligation to make sure the choice he was making was his own and was made knowingly. Flores assured the court: "I am fully aware that this is the decision I am making, and I am at ease with the decision, and I know my family members disagree with it and I've asked them not to come [to court] several, several times. . . . I'd rather keep this part of my life separate." Flores told the court he would "take what you said in consideration."

The court then met with defendant Amezcua and his defense team. It explained it knew Flores and Amezcua were friends but wanted to make sure this decision "is your decision and that you are not letting anybody influence you, including Mr. Flores." It urged Amezcua that the court "would really like you to think about this." It reminded him that that there is always a potential to do good things but that a death sentence would be more limiting than a sentence of life. It added: "I don't want you to make a decision . . . that you'll regret."

Amezcua told the court, "I thought about it for five years. . . . And I allowed Mr. Perlo to do his extensive research on my past." He assured the court it need not be concerned. The court reminded him that he would have additional time

during guilt deliberations to reconsider his choice. Amezcua replied: "I could have saved you the time and trouble down the road. I am not going to sway from my decision."

The next morning the court met with all defense counsel and both defendants. It asked Flores and Amezcua if they had had a chance to think about the previous day's discussion and whether either had changed his mind. Each defendant confirmed he had thought about the question and his mind was unchanged. Both defendants confirmed they wanted no mitigating evidence presented, no prosecution witness cross-examined, and no argument made on their behalf. Amezcua offered to put his wishes in writing, but the court replied that the written transcript would serve that purpose. The court went on to discuss the case of *People v. Sanders* (1990) 51 Cal.3d 471, wherein the defendant had made a similar choice. It again asked each defendant if it was his choice to have no defense evidence or argument presented and no cross-examination of the People's witnesses. Again, each stated that he had so chosen. All four counsel told the court they agreed that those decisions reflected their client's sincere belief.

The court read excerpts from the *Sanders* opinion and explained again that, based on that precedent, counsel on appeal could not argue it was error for the defense not to argue, present evidence, or cross-examine. Flores responded: "I am fully aware I am giving up our appeal action." Asked if he had any questions about what was being said, Amezcua replied, "None." After further colloquy, the court accepted the statements of the defendants and their counsel. The penalty phase proceeded according to defendants' directives. When counsel requested certain penalty phase instructions, each defendant objected. The instructions were not given.

Amezcua and Flores rely on the principle that when a defendant elects to be represented by counsel, he has no right to control the attorney's strategic and tactical decisions regarding the defense, including requests for jury instructions. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1163, 1164, fn. 14.) In their view, the court's permitting them to override their attorneys' efforts to present a penalty defense, including the selection of jury instructions, denied them their rights to counsel and a reliable penalty determination. They also assert that the state's independent interest in fair, accurate, and reliable penalty verdicts was violated. They acknowledge that decisions such as *People v. Bloom* (1989) 48 Cal.3d 1194, 1218–1228 (*Bloom*), *People v. Lang* (1989) 49 Cal.3d 991, 1030 (*Lang*), *People v. Sanders*, *supra*, 51 Cal.3d at pages 526–527 (*Sanders*), and *People v. Deere* (1991) 53 Cal.3d 705, 717 (*Deere*), denied relief on claims arising from the failure to present a penalty defense at trial. They distinguish those cases as involving either self-represented defendants or instances of ineffective assistance of counsel, a claim they are not raising here. To the extent those decisions are inconsistent with the position they assert here, they ask this court to reconsider them.

Defendants' arguments are unpersuasive. Thirty years of precedent, beginning with *Bloom*, *supra*, 48 Cal.3d 1194, has consistently held, among the core of fundamental questions over which a represented defendant retains control is the decision whether or not to present a defense at the penalty phase of a capital trial, and the choice not to do so is not a denial of the right to counsel or a reliable penalty determination. (See *People v. Snow* (2003) 30 Cal.4th 43, 119–121; *Deere*, *supra*, 53 Cal.3d at p. 717; *Sanders*, *supra*,

51 Cal.3d at pp. 526–527; *Lang, supra,* 49 Cal.3d at p. 1030; *Bloom,* at p. 1228.) " '[T]he required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements.' " (*Sanders,* at p. 526, fn. omitted.) Nor is a defendant deprived of his Sixth Amendment right to counsel by virtue of counsel's acquiescence in the defendant's own decision that no defense shall be presented on his behalf. That decision is the defendant's to make. (*Lang,* at pp. 1030–1031.) Despite the general rule that counsel is responsible for the selection of jury instructions, the requested instructions were properly refused in the face of defendants' objection. As the court implicitly recognized, the only reason for requesting them would be to seek a sentence of life without parole rather than death, the very decision the law commits to the defendant personally.

*McCoy v. Louisiana* (2018) ___ U.S. ___, 138 S.Ct. 1500, further supports our conclusion. There the high court distinguished between the different purviews of counsel and client. Trial management is controlled by counsel. It encompasses such functions as determining " 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' " (*Id.* at p. ___ [138 S.Ct. at p. 1508].) Choice of the defense objective is the client's prerogative. (*Ibid.*) Defendants claim

that the decision to present certain mitigating evidence or request particular jury instructions are aspects of trial management. As such they are controlled by counsel even after defendants made clear their desire to present no penalty phase defense. They are incorrect. To accept their argument would be to read out of existence the allocation of responsibilities the high court recognized in *McCoy*.

The record clearly demonstrates defendants' objective in this case. The court engaged in extensive and careful colloquy with defendants and their counsel to ensure that each defendant understood the stakes involved in pursuing his choice. It ensured each defendant had the benefit of the court's own counsel, as well as that of his lawyers. It confirmed that both defense teams had prepared a case in mitigation and were ready to present it. It gave each defendant several opportunities to ask questions and to explain his choice in his own words. It expressed its own concerns for each defendant as an individual and for the preservation of each man's procedural safeguards. The court interacted with each defendant directly and with courtesy. It took the same kind of care that is required when ensuring that the waiver of any substantial right is personally and properly made. It explicitly found that each defendant had made his own choice knowingly and voluntarily. The procedure employed here satisfied the state's interest in assuring the fairness and accuracy of the death judgments consistently with *McCoy*.

> 2. *Instruction that Death Is a Greater Punishment than Life Imprisonment without the Possibility of Parole*

During voir dire, the trial court instructed prospective jurors that death is a greater punishment than life

imprisonment without parole: "The law says life without parole is a lesser sentence. It's less serious than death. Many of you said [in questionnaire responses], My God, I'd rather be dead than spend my life in prison. I'm telling you, the law that you have sworn to follow says, No, you cannot consider that. That may be your personal feeling. But you must agree to follow the law and the law says life without parole is a lesser punishment to death." Counsel for both defendants objected, arguing that the law allows a jury to return a verdict of life without parole even if factors in aggravation substantially outweigh those in mitigation. Thus, they asserted the law does not establish that death is the more serious punishment. Defense counsel also asserted that the instruction tended to constrain jurors' decisionmaking by implying that they may not return a verdict of life without parole because it is less serious than a death verdict. The court said it found the question interesting and would look into it. Later during jury selection, when a prospective juror expressed the view that death was "the easy way out," the court repeated that life without parole is the lesser punishment, and the defense again objected. The court overruled the objection, stating it had found no law on the point, but the standard jury instructions, providing that *only* if the evidence in aggravation substantially outweighs that in mitigation may the jury return a death verdict, represented the state of the law.

Acknowledging that several of this court's decisions support the trial judge's ruling (see, e.g., *People v. Tate* (2010) 49 Cal.4th 635, 707; *People v. Harris* (2005) 37 Cal.4th 310, 361), defendants renew their claim of error. They urge that the ranking of the death penalty as more severe than life imprisonment without parole is arbitrary and violates the

Eighth Amendment. The authorities to which they point do not assist them. They point to United States Supreme Court decisions recognizing a condemned prisoner's autonomy interest in forgoing appellate relief from a death sentence (e.g., *Gilmore v. Utah* (1976) 429 U.S. 1012, 1016–1017); to various state laws recognizing a terminally ill person's right to physician-assisted suicide (e.g., Or. Rev. Stat. § 127.800 et seq.; Tex. Health & Saf. Code § 166.046(e); Wash. Rev. Code Ann. § 70.245.010 et seq.), and to the asserted existence of conditions in California prisons to argue that a rational person might prefer death to continued incarceration (see, e.g., *Brown v. Plata* (2011) 563 U.S. 493, 503–504). Obviously those cases are factually distinguishable. The state's policy of exacting the ultimate penalty for only the most aggravated crimes is a moral and normative choice independent of, and distinguishable from, the individual preferences of either persons potentially subject to the penalty or those who are called upon to impose it.

## D. Constitutionality of the Death Penalty Law

Defendants contend that many features of California's capital sentencing scheme, alone or in combination with each other, violate the federal Constitution. They acknowledge that this court has rejected similar claims but assert that we have never considered the cumulative impact of the purported defects or addressed the functioning of the system as a whole. In their view, the asserted broad applicability of the death penalty, in the context of a statute lacking certain procedural safeguards, results in an unacceptable risk of constitutionally unreliable death judgments.

In *People v. Anderson* (2018) 5 Cal.5th 372, we considered and rejected a similar argument. "Even considering the arguments in combination, and viewing the death penalty law as a whole, it is not constitutionally defective. Defendant's challenges to California's death penalty scheme 'are no more persuasive when considered together,' than when considered separately." (*Id.* at p. 426.) We reach the same conclusion here.

Regarding defendants' specific challenges, we adhere to views previously expressed. Thus:

The special circumstances set forth in section 190.2 adequately narrow the class of murderers subject to the death penalty. (*People v. Thomas* (2011) 52 Cal.4th 336, 365.)

Section 190.3, factor (a), does not permit the arbitrary and capricious imposition of the death penalty. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1288.)

The death penalty law is not unconstitutional because it does not require unanimous jury findings, beyond a reasonable doubt, that particular aggravating factors (other than prior criminality) exist or that jurors all agree on which aggravating circumstances outweigh those in mitigation. (*People v. Salazar* (2016) 63 Cal.4th 214, 255.) Nor is it the case that " 'the cruel and unusual punishment clause of the Eighth Amendment, [or] the due process clause of the Fourteenth Amendment, requires that jurors in a capital case be instructed that they must find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty.' " (*Ibid.*) " 'The United States Supreme Court's decisions in *Apprendi v. New Jersey* [(2000)] 530 U.S. 466, and its progeny,

do not establish a Sixth Amendment right to determination of particular aggravating factors, or a finding that aggravation outweighs mitigation beyond a reasonable doubt or by a unanimous jury.' [Citation.] Likewise, 'neither the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty.' " (*People v. Townsel* (2016) 63 Cal.4th 25, 72.)

" 'Written findings by the jury are not constitutionally required.' " (*People v. Salazar*, *supra*, 63 Cal.4th at p. 256.)

The absence of a requirement of intercase proportionality review does not violate the Eighth Amendment. (*People v. Thompson* (2010) 49 Cal.4th 79, 143.)

"[T]he jury's consideration of unadjudicated criminal conduct pursuant to section 190.3, factor (b), does not offend the Fifth, Sixth, Eighth, or Fourteenth Amendments to the federal Constitution or analogous provisions of the California Constitution." (*People v. Young* (2005) 34 Cal.4th 1149, 1226.)

The inclusion in the list of potential mitigating factors of such adjectives as "extreme" (see § 190.3, factors (d), (g)) and "substantial" (see *id.*, factor (g)) does not act as a barrier to the consideration of mitigation in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*People v. Foster* (2010) 50 Cal.4th 1301, 1365.)

The trial court was not required to instruct that certain sentencing factors (specifically, section 190.3, factors (d), (e), (f), (g), (h), and (j) that are introduced by the phrase " 'whether

or not' ") are relevant only as potential mitigators. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.)

The California sentencing scheme does not violate the equal protection clause of the Fourteenth Amendment by denying capital defendants certain procedural safeguards afforded to noncapital defendants. (*People v. Johnson*, *supra*, 62 Cal.4th at p. 657.)

California law does not violate international norms, and thus contravene the Eighth and Fourteenth Amendments, by imposing the death penalty as regular punishment for substantial numbers of crimes. (*People v. Merriman* (2014) 60 Cal.4th 1, 107.)

### E. Cumulative Error

Amezcua, joined by Flores, contends that errors in his trial, even if not sufficiently prejudicial to require reversal of the judgment when considered individually, do warrant reversal when assessed cumulatively. We have concluded any error in the prosecutor's guilt phase closing was harmless, as was Dr. Scheinin's testimony relating autopsy results derived from a different pathologist's report. Whether considered individually or cumulatively the errors do not warrant reversal.

### III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**O'ROURKE, J.**[*]

---

[*]     Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Amezcua & Flores

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S133660
**Date Filed:** February 28, 2019

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert J. Perry

_____

**Counsel:**

Janyce Keiko Imata Blair, under appointment by the Supreme Court, for Defendant and Appellant Oswaldo Amezcua.

David H. Goodwin, under appointment by the Supreme Court, for Defendant and Appellant Joseph Conrad Flores.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Janyce Keiko Imata Blair
1609 Border Avenue
Torrance, CA  90501
(310) 606-9262

David H. Goodwin
P.O. Box 50724
Pasadena, CA  91115
(323) 666-9960

Viet H. Nguyen
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6125