Filed 12/29/22  P. v. Perez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAIME BRISENO PEREZ,<br><br>        Defendant and<br>        Appellant. | A165848<br><br>(Kern County<br>Super. Ct. No. BF176180A) |

Defendant appeals his conviction for first-degree murder after a jury trial in which the court admitted testimony from a criminalist who relied in part upon DNA evidence generated with the use of the TrueAllele probabilistic software program (TrueAllele).  Defendant sought to discover TrueAllele's source code, and he argues that the trial court's failure to order disclosure thereof violated his right to confrontation under the Sixth Amendment of the United States Constitution.  We affirm.

## BACKGROUND

The People charged defendant with the first degree murder of Kyle Ramirez, further alleging that defendant used a knife to commit the crime and had one prison prior (Pen. Code, §§ 187, subd. (a), 667.5, subd. (b), 12022, subd. (b)(l)).

1

At trial, defendant's brother, Ricardo Briseno, testified that, in the late afternoon on April 14, 2018, Ricardo drove his younger brother to their parents' house to pick up clothing. Ricardo went into a bedroom in the garage to see if defendant was home. Ricardo saw a body on the floor covered in bags and a blanket, and defendant asleep on the bed with what appeared to be a gun. Ricardo left quickly with his younger brother and called 911.

Deputy Paxson was dispatched to the house at issue around 5:15 p.m. He had been told defendant had a gun, so he remained outside and waited for backup. When more deputies arrived, Paxson used another deputy's PA system to call for defendant to leave the house, but there was no response. Police entered the house, but did not find defendant. After a second search of the house about fifteen minutes later, police located defendant in a closet and took him into custody. Photos of defendant taken at the time showed redness on his chest and knuckles, minor scratches on his arms, a scratch on his torso, and two injuries to his ears. Paxson agreed on cross-examination that defendant had minor scratches. Police found a knife in defendant's pocket. Defendant told Paxson that his name was Esteban, but Paxson knew Esteban, one of defendant's brothers, from a prior contact.

Deputy Sanchez helped process the crime scene. The victim's body was on the floor in the bedroom, wrapped in a blanket with a trash bag and towel over his head. There was a leather belt around the victim's midsection, along with a long, black curly hair on the victim's elbow. The victim had a large

2

laceration on the back of his head, two large cuts to his throat, somewhat superficial stab wounds to his chest, and his legs were bound with a dog leash. An air soft gun was near the bed. A bottle of bleach and plastic trash bags were on the floor. Police seized a pair of blue and white Nikes near the bed, a trash bag from the bedroom containing jeans and a red t-shirt, and a trash bag from the laundry room containing a pair of grey and white Nikes. Photos were taken of bloody shoe prints on the floor, and there appeared to be blood spatter on the red t-shirt. A first aid kit containing items indicative of drug sales was found in the bedroom, along with baggies containing what appeared to be marijuana. Police observed a drawing on the bedroom wall, and the word "Trigger" appeared therein.

Detective Daniel Perez collected buccal swabs from defendant and Esteban for DNA testing. He testified that, four weeks before trial, Esteban had also been arrested for the victim's murder after police learned that his alibi was false.

Defendant's father testified that defendant sometimes stayed in the bedroom garage at his house because defendant did not have his own home. On April 13, 2018, defendant's father saw defendant with another person returning to the house with beer. Defendant's father did not recognize the man, but he described him as Hispanic and about defendant's age.

Kyle Ramirez's sister testified that she texted with her brother around 12:22 p.m. on April 13, 2018, and her brother said

3

he was at Trigger's pad.[1]  She testified on cross-examination that, after the text, she spoke to her brother on the phone, asked who "Trigger" was, and he replied, "Jaime."  She testified that she had previously given her brother rides to Trigger's house and knew the location, and her brother told her that he had been friends with defendant since age 12 or 13.

Forensic pathologist Dr. Whitmore performed Ramirez's autopsy.  He testified there was a canvas belt around Ramirez's neck, and the buckle had cut into Ramirez's skin; a belt around Ramirez's midsection had restrained his upper extremities, and a leash had been wrapped around his ankles.  There were signs of strangulation and cuts made with a sharp instrument on the body.  An injury to the back of Ramirez's head going down to the skull bone appeared to have been caused by something heavy and linear.  There were bruises on the back of the victim's hands, a rib facture on his left side, a fracture to his jawbone, and a knife wound to his chest that was not very deep.  The base of Ramirez's skull was fractured, and there was blood in his brain.  Brain swelling indicated that head trauma was inflicted while Ramirez was alive.  Dr. Whitmore opined that the cause of death was strangulation, but the head injuries also contributed, and the manner of death was homicide.  He could not estimate the time of death or say which particular knife caused Ramirez's stab wounds.

---

[1] The trial court admitted this evidence for a limited purpose and instructed the jury that it may consider this evidence only as circumstantial evidence that Ramirez was alive at the time.

Sarah Kidwell, a criminalist for the DNA analysis unit of the Kern County Regional Crime Lab, performed the DNA interpretation in this case. Reference DNA samples were taken from the victim, defendant, Esteban, and Esteban's wife. DNA testing showed that the hair from the victim's elbow, which was the only hair retrieved with a root suitable for DNA testing, belonged to defendant.

Blood stains from the exterior of the blue and white Nike shoes and the grey and white Nike shoes, the red t-shirt, and the pair of jeans found at the crime scene were swabbed for DNA and tested. The victim was a match for each blood stain.

The interior neck area of the red t-shirt was swabbed for DNA, as was the interior waistband of the jeans, the interiors of the grey and white and blue and white Nike shoes, the knife found on defendant, the belt around the victim's neck, the belt around the victim's midsection, and the leash around the victim's ankles.

The DNA profile from the interior of the red t-shirt was a mixture. Neither the victim nor defendant could be excluded as a potential contributor. The victim was 1.8 quintillion times more likely to be a match than a random Hispanic person, defendant was 4.9 billion times more likely to be a match than a random Hispanic person, and no conclusion could be drawn for Esteban. There were four contributors for the DNA profile from the interior waistband of the jeans, and three of the four known reference samples could not be excluded. The victim was 46 trillion times more likely to be a match than a random Hispanic

5

person, defendant was 99 trillion times more likely to be a match than a random Hispanic person, and Esteban was 1.1 million times more likely to be a match than a random Hispanic person.

The DNA profile obtained from the blade of the knife was a mixture, and neither defendant nor Esteban could be excluded. A match between the DNA from this item and defendant was 2.5 billion times more likely than a coincidental match to a random Hispanic person, and a match between this item and Esteban was 16 million times more likely than a coincidental match to a random Hispanic person. Kidwell confirmed that defendant's statistical numbers were higher. With respect to the DNA from the knife handle, neither defendant nor Esteban could be excluded. A match for defendant was 3.7 billion times more likely than a coincidental match to a random Hispanic male. A match between Esteban and the DNA obtained from the knife handle was 41 million times more likely than a coincidental match to a random Hispanic male.

The DNA profile obtained from the belt around the victim's midsection was a mixture. The victim was 4.3 septillion times more likely to be a match than a random Hispanic male. None of the other known reference samples could be excluded.

The DNA profile obtained from the leash around the victim's ankles was a mixture. A match for the victim was 220 billion times more likely than a coincidental match to random Hispanic male. A match for defendant was 1.5 billion times more likely than a coincidental match to random Hispanic male. And a

match for Esteban was 190,000 times more likely than a coincidental match to random Hispanic male.

Traditional STR testing and manual DNA interpretation was performed on the DNA obtained from the belt around the victim's neck, and this DNA matched that of the victim.

The DNA profile from the interior of the grey and white Nike shoes was a mixture. The victim was the major contributor, and a match to the victim was 740 septillion times more likely than a random Hispanic person. With respect to the DNA profile from the interior of the blue and white Nike shoes, neither defendant nor Esteban could be excluded. A match for defendant was 15 billion times more likely than a match for a random Hispanic person, and a match for Esteban was 3.9 million times more likely than a match for a random Hispanic person.

Where the statistical results of the DNA analysis were higher for defendant than for Esteban, Kidwell opined the results meant that "at least all or a portion of the profile obtained from the evidence was more consistent with" the known reference sample for defendant—in other words, there were "more locations, more alleles matching [defendant] than match[ing] Esteban." On cross-examination, Kidwell acknowledged and explained the concept of transfer DNA whereby humans transfer their DNA to other objects or humans upon contact, but she opined that it was unlikely this concept would affect major versus minor contributor findings.

The jury returned a guilty verdict on the first degree murder charge and found the knife use allegation true. In a

bifurcated proceeding, the trial court found the prison prior allegation not true. The court sentenced defendant to a term of 25 years to life on the murder conviction, plus one additional year for the weapon use enhancement.

## DISCUSSION

We first take a moment to clarify defendant's Sixth Amendment claims. In his opening brief, defendant relies primarily on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), and the ensuing line of United States Supreme Court jurisprudence precluding the admission of testimonial hearsay against a defendant at trial (discussed, *post*). Defendant argues that the trial court committed *Crawford* error by failing to require disclosure of TrueAllele's source code because: (1) the source code is akin to a human witness and is a declarant; or (2) the source code is itself testimonial hearsay. Thereafter, defendant claims that he had a Sixth Amendment right to discover the source code at the pretrial stage, referencing *Davis v. Alaska* (1974) 415 U.S. 308, 320–321 (*Davis*), which held that the denial of the opportunity to cross-examine a crucial adverse witness for bias at trial violated the confrontation clause. Then, in his reply brief, defendant appears to clarify that his argument in this appeal is that his rights under *Crawford* were violated by the trial court's failure to order disclosure of TrueAllele's source code because the source code constitutes a testimonial hearsay statement (made by TrueAllele's programmer) that Kidwell disclosed in her testimony. Given the lack of clarity and

8

inconsistencies in defendant's briefing, we will address the arguments he makes under both *Crawford* and *Davis*.

## I. Additional Procedural Background

Defendant filed a pretrial discovery motion pursuant to Penal Code section 1054 et seq. requesting the source code for TrueAllele[2]. The prosecutor opposed the request, arguing that the source code was a trade secret, and the court denied the motion.

Subsequently, defendant filed a motion in limine, again requesting the disclosure of all source code for TrueAllele to allow his defense expert to testify about the potential flaws and biases in the program and "meaningfully confront the human choices behind the algorithm." This motion repeated almost word-for-word defendant's pretrial discovery motion. The trial court heard argument, stated that it had reviewed the law on this issue, and denied the motion.

---

[2] In his briefing on appeal, defendant states that TrueAllele is a probabilistic genotyping software. Citing a law review article (Eidelman, *The First Amendment Case for Public Access to Secret Algorithms Used in Criminal Trials*, Vol. 34:4 Georgia State Univ. L.Rev. (2018) 915, 920–921), he explains that "[p]robabilistic genotyping differs from traditional DNA analysis by making a sketch of a known genetic profile using the algorithm's input before searching for a match. . . . The output of a program like TrueAllele is expressed as a likelihood ratio, which is 'a statistic that is computed by dividing (1) the estimated probability that the owner of the DNA in the tested sample has the suspect's DNA by (2) the probability that a random person of a particular race or ethnicity has the suspect's DNA profile.' "

9

During trial, Kidwell testified about the DNA analysis of physical evidence collected during law enforcement's investigation of Ramirez's murder. Kidwell described the TrueAllele software as "a way to analyze the sample essentially to determine what genotypes are present and the probabilities of those genotypes." She testified that if a DNA sample is below the threshold required to perform manual analysis for STR testing, then TrueAllele could possibly be utilized. Kidwell described TrueAllele as a computer software program with source code.

During Kidwell's testimony, defendant made an oral motion outside the presence of the jury and requested that the court admonish the jury that he had been denied access to TrueAllele's source code. In response to the trial court's questioning during that motion, Kidwell confirmed that a simplistic description of how she utilized TrueAllele was that she entered data into the program, the computer asked her questions, and she answered the questions. Kidwell elaborated that a person, while being monitored to protect TrueAllele's intellectual property, could view the source code at the company's headquarters. She explained that she had never seen TrueAllele's source code, and she performed her DNA analysis without knowing anything about the source code. During the colloquy between court and counsel, defense counsel noted that he had cross-examined the author of the TrueAllele source code, Dr. Perlin, in a prior case.

## II. The *Crawford* Error Claim

The Sixth Amendment's confrontation clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) *Crawford* held that the confrontation clause bars the admission of a testimonial hearsay statement against a defendant at trial unless the maker of the statement is unavailable at trial and the defendant had a prior opportunity to cross-examine that person or the declarant appears for cross-examination at trial. (*Crawford*, *supra*, 541 U.S. at pp. 53, 59 & fn. 9.) The testimonial statement at issue in *Crawford* was made by defendant's wife during police interrogation, but the high court did not precisely define the scope of statements that are to be considered "testimonial" under the confrontation clause. (*Crawford*, at pp. 38, 51, 68.) The high court did, however, cite language in prior decisions describing testimonial statements as including " 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' " (*Id.* at p. 51.)

Subsequently, the United States Supreme Court applied *Crawford* to reports involving scientific test results in *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez–Diaz*), *Bullcoming v. New Mexico* (2011) 564 U.S. 647 (*Bullcoming*), and *Williams v. Illinois* (2012) 567 U.S. 50 (*Williams*).

In *Melendez–Diaz*, which involved charges of cocaine distribution and trafficking, crime lab analysts prepared documents certifying that a sample of material recovered from

the defendant was tested and contained an illegal drug.  The certificates were sworn to before a notary public, as required by state law, and admitted at trial in lieu of the analysts' testimony.  (*Melendez–Diaz, supra*, 557 U.S. at p. 308.)  The high court reasoned that the certificates were "quite plainly affidavits," and "are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " (*Id.* at pp. 310–311).  The high court concluded:  "[U]nder our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." (*Id.* at p. 311.)

In *Bullcoming*, an analyst tested the blood sample of an alleged drunk driver.  (*Bullcoming, supra*, 564 U.S. at p. 651.)  In his lab report, the analyst attested that he performed the test using normal protocol and signed the report, and the report was admitted into evidence through a surrogate analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the defendant's] blood sample." (*Ibid*.)  *Bullcoming* rejected the argument that an opportunity to cross-examine the surrogate analyst satisfied *Crawford*.  (*Id.* at p. 652.)  In doing so, the high court rejected the New Mexico Supreme Court's conclusion that the report merely set forth a machine-generated result, observing that the testing analyst reported several facts relating to past events and human actions, as opposed to machine-produced data, and the analyst's statements were "meet for cross-examination." (*Id.* at pp. 659-660.)  *Bullcoming* also rejected the claim that the report was

12

nontestimonial:  Even though the report was not a formal affidavit, it was a sufficiently formal and official document "created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, [and so] ranks as testimonial." (*Id.* at p. 664.)

Next, in *Williams*, *supra*, 567 U.S. 50, 57, at issue was a police forensic biologist's testimony that a DNA profile produced by a Maryland laboratory was derived from semen on vaginal swabs taken from the rape victim, and that the profile matched a DNA profile derived from a sample of the defendant's blood produced by the police laboratory. (*Id.* at p. 56 (plur. opn. of Alito, J.).)  The plurality opinion by Justice Alito concluded, based on two alternative grounds, that the expert testimony did not violate the Confrontation Clause.  First, the plurality reasoned, the testimony regarding the Maryland laboratory's report on the DNA profile was admitted not for its truth, but only for the limited purpose of explaining the basis of the police biologist's independent conclusion, based on her expertise, that the defendant's DNA matched the DNA in the semen found on the vaginal swabs. (*Id.* at pp. 57–58.)  Alternatively, the plurality reasoned, there was no constitutional violation because the Maryland laboratory's report was not "for the primary purpose of accusing a targeted individual." (*Id.* at pp. 83–86.)  In a concurring opinion, Justice Thomas agreed that the expert testimony did not violate the Confrontation Clause, but for a completely different reason:  The Maryland laboratory report "lack[ed] the solemnity of an affidavit or deposition" and was

13

therefore not "testimonial." (*Id.* at p. 111 (conc. opn. of Thomas, J.).)

Defendant's *Crawford* challenge lacks merit. His argument is that the court's failure to order production of the source code violated the Sixth Amendment as interpreted by *Crawford* because the source code is testimonial hearsay that Kidwell disclosed through her testimony regarding the likelihood ratios. Defendant misunderstands *Crawford*. *Crawford* held that the confrontation clause bars the admission of testimonial hearsay statements against a defendant *at trial* unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine that person or the declarant appears at trial. (*Crawford*, *supra*, 541 U.S. at pp. 53, 59 & fn. 9.) *Crawford* is "concerned *solely* with [the admission at trial of] hearsay statements that are testimonial" (*People v. Cage* (2007) 40 Cal.4th 965, 981), and it requires a trial objection. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 911 [failure to object to offending testimony forfeits *Crawford* claim]; Evid. Code, § 353.) Here, defendant asked the court during trial to inform the jury that the court had denied defendant's request for the source code, but he did not move to strike any of Kidwell's testimony based on the theory that the TrueAllele source code was testimonial hearsay that Kidwell improperly conveyed to the jury. Defendant's pretrial motion and motion in limine raised a discovery issue and sought production of the source code, but *Crawford* is not a mechanism for obtaining discovery. Defendant's contention that the *failure to order production of*

14

*TrueAllele's source code* violated the confrontation clause under *Crawford* thus fails.

Nonetheless, even assuming the trial court committed error in failing to order disclosure of TrueAllele's source code, any such error was harmless beyond a reasonable doubt given the overwhelming evidence of defendant's guilt unrelated to TrueAllele. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Jennings* (2010) 50 Cal.4th 616, 652 [finding alleged *Crawford* error harmless beyond a reasonable doubt under *Chapman* in light of other overwhelming circumstantial evidence]; *People v. Bell* (2020) 47 Cal.App.5th 153, 196–197 [finding *Crawford* error harmless where other evidence overwhelmingly proved facts at issue].) The victim's body was found in a small bedroom in defendant's parents' house where defendant stayed. Defendant and the victim were together at the house the day before the victim's was found dead. Defendant's parents were away when defendant's brother found defendant sleeping in the bedroom where the victim's body lay covered in bags and a blanket. Some of the blood on the garbage bag covering the victim was still wet when police found the body, an investigating office confirmed there was both dry and wet blood at the scene when the body was found, and there was blood on the bedroom floor and furniture. When the police arrived at the house, announced their presence, and ordered defendant to come out, he hid for over fifteen minutes while police searched the home. When police finally found defendant hiding in a closet, he had fresh injuries and he lied to police about his name. Further,

15

DNA evidence unrelated to TrueAllele established that a hair found on the victim's elbow belonged to defendant.

## III. The Claim of Error under *Davis*

Restrictions imposed on the cross-examination designed to test witness credibility can, in certain instances, result in confrontation clause violations. For example, in *Davis*, *supra*, 415 U.S. 308, the defendant was charged with burglarizing a bar and stealing its safe, and a crucial witness testified that he saw the defendant with a crowbar near the place where the empty safe was discovered. (*Id.* at pp. 309–310.) At the time of trial, the witness was on juvenile probation for burglarizing two cabins. (*Id.* at pp. 310–311.) Despite the defendant's argument that he needed to probe the witness's probation status on cross-examination to reveal the witness's possible bias in cooperating with the police, the trial court refused to permit counsel to inquire into the subject. (*Id.* at p. 311.) *Davis* held that, under the confrontation clause, a defendant could not be prevented at trial from cross-examining a crucial witness for bias, even though the questions called for information made confidential by state law. (*Id.* at pp. 317–318.) The test used to assess whether a court's limitation on cross-examination pertaining to the credibility or bias of a witness violates the confrontation clause is whether "a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 624.)

Here, there was no confrontation clause violation under *Davis* even if we were to accept defendant's seemingly tenuous contention that a defendant has a Sixth Amendment right to *pretrial* disclosure of privileged information purportedly needed for effective cross-examination. (See *People v. Hammon* (1997) 15 Cal.4th 1117, 1124, 1128 [reviewing high court jurisprudence and finding no pretrial right to disclosure of privileged information under Sixth Amendment].) Defendant argued in his opening brief that the source code was required for "meaningful cross-examination of the prosecution witnesses relying on evidence derived from [TrueAllele]." Kidwell was the prosecution's witness, and, as defendant concedes many times in his reply brief, Kidwell "lacked direct knowledge of the source code and thus [did] not know the assumptions or biases of the programmer who wrote it." Nothing prevented defendant from cross-examining Kidwell on the fact that she lacked any knowledge of the source code, nor did anything prevent defendant from seeking to strike Kidwell's TrueAllele-related testimony based on his claimed lack of ability to cross-examine her effectively. Defendant admits, however, that because of Kidwell's lack of personal knowledge, she "could not be cross-examined about any potential errors or biases that may have influenced the results she testified to regarding the likelihood ratios." Thus, defendant has not shown that the prohibited cross-examination

17

would have produced a significantly different impression of the credibility of Kidwell's testimony.[3]

## DISPOSITION

The judgment is affirmed.


BROWN, J.



WE CONCUR:


STREETER, ACTING P. J.

GOLDMAN, J.


*People v. Perez* (A165848)

---

[3] We note that defendant's trial counsel was well aware that Dr. Perlin wrote the TrueAllele source code, and the record does not reflect any effort to subpoena Dr. Perlin. Instead, defendant argued to the trial court that he was entitled to disclosure of the source code to put on a defense and to call his own expert to testify regarding the bias and assumptions therein. We express no opinion on the merits of such argument because defendant does not pursue it on appeal. We similarly express no opinion on the question of whether a defendant has a right to discover the source code for probabilistic genotyping software for purposes of conducting a hearing under *People v. Kelly* (1976) 17 Cal.3d 24 (see *State v. Pickett* (N.J. App. 2021) 466 N.J. Super. 270 [246 A.3d 279]), as that issue is not before us.