Filed 4/19/23  P. v. Woosley CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

LANNY BENNETT WOOSLEY,

    Defendant and Appellant.

E077998

(Super. Ct. No.  FWV030154)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Corey G. Lee, Judge.  Affirmed.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Alan L. Amann and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

# INTRODUCTION

Defendant and appellant Lanny Bennett Woosley appeals from the trial court's denial of his petition to vacate his murder and attempted murder convictions and for resentencing under Penal Code[1] section 1172.6 (formerly section 1170.95).[2] He contends the court erred in denying his petition without issuing an order to show cause and conducting an evidentiary hearing because (1) he had established a prima facie case for relief, (2) the court engaged in improper factfinding, and (3) the jury's finding of guilt involving willful, deliberate, and premeditated murder and attempted murder did not make him ineligible for relief as a matter of law. We find no error and affirm the order.

# II.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*[3]

On January 18, 2004, defendant visited the home of Alejandro and Mayra Rivas in Hesperia. Alejandro Rivas was Erik Rivas's brother. Mayra's cousin, Alexis Jimenez,

---

[1] All future references are to the Penal Code unless otherwise stated.

[2] Effective June 30, 2022, the Legislature renumbered section 1170.95 as section 1172.6, with no substantive change in text. (Stats. 2022, ch. 58, § 10.) We cite to section 1172.6 for ease of reference unless otherwise indicated.

[3] The factual background related to counts 1, 2 and 3 is taken from this court's nonpublished opinion in defendant's direct appeal, case E039885. (*People v. Woosley* (Sept. 21, 2007, No. E039885) [nonpub. opn.] (*Woosley I*).) The factual background excludes the facts related to counts not relevant to this appeal.

was also there. Defendant and Jimenez had not met before; however, they were around the same age, and they seemed to get along well. Around 10:00 p.m., defendant and Jimenez said they wanted to go out. They borrowed the Rivases' maroon Honda Accord. (*Woosley I*, *supra*, E039885.)

Sometime after 11:00 p.m., Michael Universal was taking his friends Chris Heyman and Blake Harris home from a party in Upland. They had all been drinking; Universal had had "a few" beers. Universal was driving his father's Ford Mustang. He got on the I-210 freeway at Campus Avenue, heading east. He denied having any "confrontation" with any other vehicle. He stayed in the slow lane the whole the way. (*Woosley I*, *supra*, E039885.)

Harris, who had been talking to his girlfriend on his cell phone, asked Universal to go back to Upland to pick her up. Universal got off at the Haven Avenue offramp. He turned left (north) onto Haven, went over the freeway, then got into a left-turn lane, preparing to get back onto the freeway and go west. There were two left-turn lanes; the Mustang was in the one farthest to the left. (*Woosley I*, *supra*, E039885.)

Suddenly, shots were fired into the Mustang. Universal was not hit, but Heyman and Harris were killed. The shots came from the rear and a little to the left of the Mustang-i.e., from southbound Haven. At the scene, the police later found 48 nine-millimeter shell casings. (*Woosley I*, *supra*, E039885.)

3

A search of defendant's home revealed a collection of newspapers containing articles about the shooting. (*Woosley I*, *supra*, E039885.)

Erik Rivas testified pursuant to a grant of immunity. (*Woosley I*, *supra*, E039885.) On the night of January 18-19, 2004, Erik went out to the garage of defendant's house in Rancho Cucamonga and found both defendant and Jimenez there. According to Erik, defendant told him that a Mustang had cut him and Jimenez off on the freeway. When they got off the freeway, at Haven, defendant got out of the car, pulled out a gun, and "sprayed" the Mustang. There were three people inside. Defendant saw them "slumped over." He "was pretty much bragging about it." He showed Erik the gun. (*Woosley I*, *supra*, E039885.)

About a week after the shooting, Erik ran into defendant at the home of a mutual friend. Erik had heard that his brother's car had been used in the shooting. Erik told defendant that, if his brother "were to go down for this shooting," then he was "going to say something about it . . . ." Defendant responded, "I wasn't the shooter. I was just the driver." (*Woosley I*, *supra*, E039885.)

During a police interview on January 27, 2004, defendant said that on January 18, he and Jimenez borrowed the Rivas's Accord to buy some methamphetamine in Pomona from a friend of Jimenez, but the friend was not home. They got back on the I-210 freeway, heading east, towards defendant's house (which was near Archibald and Highland Avenues). Defendant was driving. (*Woosley I*, *supra*, E039885.)

4

They got off at Campus Avenue. At that point, defendant said, "the car" almost hit them. (After saying that, however, defendant denied that "the car" was the Mustang.) Defendant then changed his mind about the best route to his house; he decided to get back on the freeway. When he did, "the Mustang was there . . . ." The Mustang "swerved over towards us . . . and we were playing like, you know, little fucking bullshit . . . ." Jimenez told defendant to "speed up to 'em." (*Woosley I*, *supra*, E039885.)

Both cars got off at Haven. The Mustang turned left (north). Defendant turned right (south). Once again, however, he changed his mind about the best way to go. He made a U-turn so he could get back on the freeway, intending to go west. There were two left-turn lanes leading to the freeway. Defendant was in the inside lane; the Mustang was in the outside lane, stopped. There were three people in the Mustang. (*Woosley I*, *supra*, E039885.)

Defendant said: "And then I made a left-hand turn to get back on the freeway and I heard pow, pow, pow." He repeatedly said that Jimenez "hung out the window." Defendant looked back in his rearview mirror and saw the victims "all still." Jimenez said, "Keep driving," so defendant continued on to his house. (*Woosley I*, *supra*, E039885.)

When they arrived, Erik was in the garage. Defendant admitted telling him about the shooting but denied telling him that he was the shooter. Defendant claimed that Erik was lying: "[H]e . . . has a grudge against me because I took his amp." (*Woosley I*, *supra*, E039885.)

5

At first, defendant told the interviewing detective that the gun belonged to Jimenez. Eventually, however, he admitted, "It's my gun," adding " . . . I'm obsessed with that . . . gun." He had gotten the gun after he himself was kidnapped. The detective asked him, "Why would you give your gun to Jimenez?" Defendant answered, "I don't know." "It doesn't make no sense." Defendant conceded, "why would you have anybody hold your bitch for you?" (*Woosley I*, *supra*, E039885.)

At trial, defendant testified that, on January 18, 2004, as he and Jimenez were driving back from Pomona, his AP9 was in a bag on the passenger-side floorboard. When they were on the Campus Avenue off-ramp, a Mustang on the on-ramp crossed into their lane and ran them off the road. After they got back on the freeway, Jimenez said, "Hey, there's that Mustang. Speed up." Defendant complied. (*Woosley I*, *supra*, E039885.)

After defendant got off on Haven, made a U-turn, and got ready to get back onto the freeway, he saw the Mustang again. Although it was in a left-turn lane, it was pointing diagonally to the right, as if the driver intended to get back onto Haven. Defendant therefore swerved around it on the left, even though this took him into the southbound traffic lanes. (*Woosley I*, *supra*, E039885.)

At defendant's house, after the shooting, defendant realized for the first time that Jimenez had a sawed-off shotgun, wrapped in a jacket. (*Woosley I*, *supra*, E039885.)

6

A few days after the shooting, defendant ran into Erik at a friend's house. Erik warned him, "If my brother gets wrapped up into this . . . I'm going to say anything to make you the shooter." Previously, defendant's mother had thrown Erik out of the house because she believed that he had stolen some tools. Also, defendant had lent Erik money to buy an amplifier; when Erik failed to pay him back, defendant had taken the amplifier. (*Woosley I*, *supra*, E039885.)

On January 20, 2004, Jimenez committed a carjacking in Fontana. A police chase ensued. After colliding with a police car, Jimenez appeared to be reaching for a gun; the police opened fire. Jimenez died in a hail of bullets. (*Woosley I*, *supra*, E039885.)

An AP9 nine-millimeter handgun was found by Jimenez's body. This turned out to be the weapon used to shoot up a van, as well as the weapon used to kill Heyman and Harris. Originally semiautomatic, the gun had been modified to make it fully automatic. It could fire at the rate of about 1,900 rounds a minute. Neither the prosecution expert nor the defense expert had ever heard of a handheld gun that fired that fast. The defense expert testified, "I've seen military weapons a little higher in terms of rate of fire, but for this type of weapon it's actually almost an unbelievable figure." (*Woosley I*, *supra*, E039885.)

B. *Procedural Background*

On December 21, 2005, a jury found defendant guilty of two counts of first degree murder (§§ 187, subd. (a), 189; counts 1 & 2); one count of willful, deliberate, and premeditated attempted murder (§§ 187, subd. (a), 664, subd. (a); count 3); two counts of

unpremeditated attempted murder (§§ 187, subd. (a), 664, subd. (a); counts 4 & 6;) two counts of making a criminal threat (§ 422; counts 5 & 9); one count of assault with intent to commit a specified sexual offense (§ 220; count 7); one count of forcible oral copulation (§ 288a, subds. (a), (c)(2); count 8); one count of carjacking (§ 215; count 10); and one count of arson of property (§ 451, subd. (d); count 11). As to counts 1 and 2, the jury found true the multiple-murder special circumstances (§ 190.2, subd. (a)(3)) enhancement allegation. The jury found not true the personal discharge of a firearm (§ 12022.53, subd. (b)) allegation as to counts 1 through 3, but true as to counts 4, 6, 7, 8 and 10.

On January 31, 2006, the trial court sentenced defendant to four consecutive life terms (including two without the possibility of parole), plus a total determinate term of 44 years 4 months to state prison. (*Woosley I*, *supra*, E039885.) Following appeals by defendant, his sentence was ultimately modified, on December 22, 2008, to a total determinate term of 37 years 4 months, plus two terms of life without the possibility of parole, plus a consecutive term of life with the possibility of parole.

On March 16, 2021, defendant, represented by retained counsel, filed a petition to vacate his murder convictions in counts 1 and 2 and to resentence him under section 1172.6.[4]

---

[4] The actual petition was lost and could not be located. On November 23, 2021, with respect to defendant's petition for resentencing, a deputy clerk submitted an affidavit stating that "The Appeals division has reviewed the file and reached out to court staff as well as counsel for all parties. The document is unavailable for inclusion in the clerk's transcript on appeal."

Following briefing by both parties, the trial court heard the petition on October 15, 2021. The court indicated that it had reviewed the motions filed by the parties, the court files, and the record of conviction, which included the verdict forms used and unused, the charging documents, minute orders, the jury instructions, and our September 2007 opinion from defendant's first appeal. Defense counsel argued that defendant had made a prima facie case for relief entitling him to an evidentiary hearing. The prosecutor responded that defendant had not met his burden of showing that he could not still be convicted of first or second degree murder under the new law.

The court denied defendant's petition, explaining as follows: ". . . So having reviewed all of this carefully, and, of course, I read the briefing filed by both parties, it appears that based on all of this, it appears that the defendant has not shown a prima facie case that he is eligible for [former section] 1170.95. And here is what I gathered from the court files, the record of conviction: [¶] It appears the instructions for felony murder rule and the natural and probable consequence doctrine are only given for the second degree murder. For first degree, the only instructions given were for premeditation and deliberation and drive-by shooting. And the drive-by shooting in and of itself requires the element of intent to kill. [¶] The defendant was convicted of two counts of first degree murder, and based on the jury instructions, it does appear that the first degree was -- the conviction was based on the theory of either premeditation, deliberation, or shooting at a vehicle. [¶] Now, the use or discharge of firearm enhancements were found to be not true under Counts 1 and 2. And there's some indication that jurors were kind of

split on that, and ultimately they found the allegations not true. This, in addition to the fact that there's no felony murder rule or the natural and probable consequences doctrine instructions given for the first degree murder, and the fact that there was a general aiding and abetting instruction was given, there is an aiding abetting instruction that talks about natural and probable consequence. But that, it appears, goes towards second degree murder. And then there's a general aiding and abetting instruction. Okay. [¶] And given the general aiding and abetting instruction, it appears that ultimately the defendant was convicted of first degree murder with premeditation and deliberation under the direct aiding and abetting theory. That's what the record of conviction shows. [¶] So it does not appear that the defendant's liability was based on the felony murder rule or the natural and probable consequence doctrine. It does appear, at minimum, that the jurors found that he was acting in concert and aiding and abetting the actual killer. Meaning that the defendant had the intent to kill. [¶] And this is also supported by the guilt finding by the jurors on Count 3 where the defendant was found guilty of attempted murder against the driver in the Mustang during the same shooting from a vehicle incident where the two passengers were killed. And that was for Counts 1 and 2. [¶] It is -- the relief is restricted to petitioners who can demonstrate that she or he was convicted under the felony murder rule or the natural and probable consequence doctrine. And here it does not appear that the petitioner has shown that, given the record of conviction. So the petition will be denied." Defendant timely appealed.

10

III.

DISCUSSION

Defendant argues the trial court erred in summarily denying his petition because he had established a prima facie case for relief. He further asserts the court erred by engaging in improper factfinding, and the jury's findings the murders (counts 1 & 2) and attempted murder (count 3) were willful, deliberate, and premeditated did not make him ineligible for relief as a matter of law.

A. *Legal Background*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 846-847; see Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature accomplished this by amending sections 188 and 189.

Section 188, which defines malice, now provides in part: "Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); Stats. 2018, ch. 1015, § 2.) Section 189, subdivision (e) now limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration

11

of a felony listed in subdivision (a) [defining first degree murder] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (Stats. 2018, ch. 1015, § 3.)

Effective January 1, 2022, Senate Bill No. 775 expanded eligibility for relief to include individuals convicted of "attempted murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a), as amended by Stats. 2021, ch. 551, § 2; Legis. Counsel's Dig., Sen. Bill No. 775 (2021-2022 Reg. Sess.).)  But it did not expand eligibility for relief pursuant to section 1172.6 to one who directly aids and abets another who commits murder or attempted murder.

Senate Bill No. 1437 also created a procedure for offenders previously convicted of felony murder or murder under the natural and probable consequences doctrine to seek retroactive relief if they could no longer be convicted of murder under the new law. (§ 1172.6, subd. (a); *People v. Gentile*, *supra*, 10 Cal.5th at p. 843; *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*); *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)  "[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that '[t]he petitioner could not

12

presently be convicted of murder or attempted murder because of changes to . . . [s]ection 188 or 189 made effective January 1, 2019 . . . .'" (*Strong*, *supra*, at p. 708, fn. omitted.) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Ibid*.)

In *Lewis*, *supra*, 11 Cal.5th 952, our Supreme Court explained the trial court's role in deciding a section 1172.6 petition: Petitioners who request counsel "are entitled to the appointment of counsel upon the filing of a facially sufficient petition . . . ." (*Id*. at p. 957.)[5] "[O]nly after the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.'" (*Ibid*.; see also *id*. at p. 966 ["a complying petition is filed; the court appoints counsel, if requested; the issue is briefed; and then the court makes [its] prima facie determination"].) The court's "prima facie inquiry . . . is limited. . . . '"[T]he court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause."' [Citation.] '[A] court should not reject the petitioner's factual allegations

---

[5] In Senate Bill No. 775, the Legislature amended the language of section 1172.6, codifying *Lewis*, *supra*, 11 Cal.5th 952, expanding the scope of the petitioning process and clarifying some of the procedural requirements. (Stats. 2021, ch. 551, § 2.)

on credibility grounds without first conducting an evidentiary hearing.'" (*Id*. at p. 971.) Importantly, "[i]n reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Id*. at p. 972.)

If a petitioner has made a prima facie showing of entitlement to relief, "'the court shall issue an order to show cause.'" (*Strong*, *supra*, 13 Cal.5th at p. 708.) Once the court determines that a defendant has made a prima facie showing, it "must [then] hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill [No.] 1437. [Citation.] 'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'" (*Strong*, *supra*, at p. 709; accord, *Lewis*, *supra*, 11 Cal.5th at p. 960.) "Senate Bill [No.] 1437 relief is unavailable if the defendant was either the actual killer, acted with the intent to kill, or 'was a major participant in the underlying felony and acted with reckless indifference to human life . . . .'" (*Strong*, *supra*, at p. 710.)

B. *Standard of Review*

In this case, the trial court denied defendant's petition at the prima facie stage under section 1172.6, subdivision (c). A denial at this stage is appropriate only if the record of conviction demonstrates that the petitioner is ineligible for relief as a matter of law. (*Lewis*, *supra*, 11 Cal.5th at p. 960.) This is a purely legal conclusion, which we review de novo. (See *id*. at p. 961.)

C. *Analysis*

The trial court here properly relied on defendant's record of conviction, including the jury instructions, to discern defendant's ineligibility as a matter of law at the prima facie stage. As our Supreme Court has stated, "the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1172.6,] subdivision (c)," but cannot "engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

The trial court here did not weigh evidence or exercise any discretion. Rather, the court explained the jury instructions given at defendant's trial and the jury's findings. Discerning what the jury found is not weighing evidence; it is determining what the factfinder found after the factfinder weighed the evidence. (See, e.g., *People v. Coley* (2022) 77 Cal.App.5th 539, 546-547 (*Coley*) [analyzing jury instructions to determine prima facie eligibility]; *People v. Garcia* (2022) 76 Cal.App.5th 887, 894-895 [same].)

15

In this case, defendant was convicted of first degree murder, and could have been found guilty only under two theories: (1) premeditated and deliberate murder, or (2) drive-by murder with the specific intent to kill. Both theories are still valid theories of murder given the necessary finding of a specific intent to kill. (*People v. Romero* (2022) 80 Cal.App.5th 145, 152 ["a petitioner is ineligible for resentencing if he or she . . . acted with the intent to kill"].) Defendant argues he could have been convicted under the natural and probable consequences theory, citing the jury instructions. But the jury instructions did not permit the jury to find defendant guilty of first degree murder under the natural and probable consequences theory and we presume the jury followed the instructions. (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

The trial court here instructed the jury with CALJIC No. 3.00, which defined principals and aiders and abettors: "Persons who are involved in [committing] [or] [attempting to commit] a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who directly and actively [commit] [or] [attempt to commit] the act constituting the crime, or [¶] 2. Those who aid and abet the [commission] [or] [attempted commission] of the crime." The court also instructed the jury on aiding and abetting liability with CALJIC No. 3.01: "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator; . . . [¶] (2) With the intent or purpose of committing

16

or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime."

The court instructed the jury on the natural and probable consequences doctrine with CALJIC No. 3.02. The court told the jurors that, to find defendant guilty of murder as alleged in counts 1 and 2, they had to find "1. The crime of shooting from a vehicle was committed; [¶] 2. The defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of shooting from a vehicle; and [¶] 4. The crimes of murder were a natural and probable consequences of the crime of shooting from a vehicle."

The court also instructed the jury on the definition of murder (CALJIC No. 8.00), elements of murder (CALJIC No. 8.10), the definition of malice (CALJIC No. 8.11), the definition of deliberate and premeditated murder (CALJIC No. 8.20), the elements of murder perpetrated by means of discharging a firearm from a motor vehicle with the intent to inflict death (drive-by-murder) (CALJIC No. 8.25.1), the elements of attempted murder (CALJIC No. 8.66), and the requirements for a true finding on the allegation the attempted murder "was willful, deliberate, and premeditated" (CALJIC No. 8.67). The elements of drive-by-murder specifically required the jury to find "defendant specifically intended to kill a human being."

The court further instructed the jury with the definition of second degree felony murder (CALJIC No. 8.32) that the "unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs as the direct causal result of the

17

commission [or attempted commission] of the crime of shooting from [a] vehicle is murder of the second degree when the perpetrator had the specific intent to commit that crime. [¶] The specific intent to commit shooting from [a] vehicle and the commission or attempted commission of that crime must be proved beyond a reasonable doubt." The jury was also instructed with aider and abettor second degree felony murder (CALJIC No. 8.34), which provided: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of shooting from [a] vehicle, a felony inherently dangerous to human life, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the second degree, whether the killing is intentional, unintentional, or accidental."

As to counts 1 and 2, the jury found defendant guilty of murder in the first degree. As to count 3, the jury found defendant guilty of attempted murder with premeditation and deliberation. By doing so, the jury necessarily concluded that defendant intentionally killed the two victims and attempted to kill the third victim of the drive-by-shooting as a direct aider and abettor. Based on the jury instructions given at trial and the jury's verdict, it is clear defendant was prosecuted as a direct aider and abettor to the murders and attempted murder, and the jury found that defendant intended to aid and abet two first degree, deliberate and premeditated murders and one premediated and deliberate

18

attempted murder.  Defendant could be prosecuted for murder and attempted murder under the same direct aiding and abetting theory today.  "Senate Bill [No.] 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought."  (*People v. Gentile*, *supra*, 10 Cal.5th at p. 848.)

Although CALJIC No. 3.00's use of "equally guilty" has the potential to be misleading,[6] the jury in this case was instructed to "[c]onsider the instructions as a whole and each in light of all the others" (CALJIC No. 1.01).  The possibility that the jury may have imputed express malice to defendant based on the "equally guilty" language is foreclosed by CALJIC No. 3.01, which required the jury to conclude that defendant acted "*with knowledge of the unlawful purpose of the perpetrator*, and . . . with the intent or purpose of committing, encouraging, or facilitating the commission of the crime." (CALJIC No. 3.01, italics added.)  Because CALJIC Nos. 8.20, 8.25.1 and 8.66 required a determination that the perpetrator acted with express malice, or an intent to kill, defendant's convictions of murder and attempted murder as a direct aider and abettor demonstrates that the jury concluded that defendant had knowledge of the direct perpetrator's intent to kill and that defendant aided in the commission of the crime with

---

[6] See *People v. Nero* (2010) 181 Cal.App.4th 504, 516, 518 [the "equally guilty" language in CALJIC No. 3.00 is inconsistent with "the notion that an aider and abettor's mens rea 'floats free'" and thus "can be misleading"]; accord, *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 918 ["former CALJIC No. 3.00 'could be misleading if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding'"].

19

the purpose of killing. In other words, the jury necessarily determined that defendant himself harbored express malice.

Defendant argues that because the premeditation allegation did not require the jury to find that he personally premeditated the crime establishes that the jury understood that they could impute a mental state from the actual killer to defendant, regardless of defendant's actual intent. We disagree. Whether a crime was committed with express malice is a separate consideration from whether it was premeditated. (See *People v. Smith* (2005) 37 Cal.4th 733, 739-740 [attempted murder requires specific intent to kill, and the prosecution may seek an additional finding of premeditation "for purposes of sentence enhancement"].) Section 1172.6 provides relief only where a defendant has been convicted under a theory of imputed malice, not imputed premeditation. (§ 1172.6, subd. (a).) To return a guilty verdict on first degree murder, the jury necessarily concluded that defendant premeditated and deliberated the crimes or with an intent to kill. Furthermore, because the crime of attempted murder requires a specific intent to kill and the jury was so instructed, and the jury found the attempted murder was premediated and deliberate, the jury necessarily found that defendant himself harbored express malice. (See *People v. Guerra* (1985) 40 Cal.3d 377, 386 [the crime of attempted murder requires a specific intent to kill, a mental state coincident with express malice].)

Our conclusion is supported by our high court's decision in *People v. Johnson* (2016) 62 Cal.4th 600 (*Johnson*). Although *Johnson* did not concern a petition for resentencing, the defendant in the case was convicted of first degree murder and argued that "instructing with CALCRIM former No. 400 violated his right to due process because the instruction misdescribed the prosecution's burden of proving his liability as an aider and abettor and permitted the jury to convict him of first degree murder based on the culpability of the perpetrator . . . without considering his own mental state." (*Id*. at p. 638.) Similar to CALJIC No. 3.00, former CALCRIM No. 400 stated that "'[a] person is *equally guilty* of the crime whether he committed it personally or aided and abetted the perpetrator who committed it.'" (*Johnson*, *supra*, at p. 638.) The jury in *Johnson* was also instructed with CALCRIM No. 401 which, like CALJIC No. 3.01, stated "that for [the jury] to find defendant guilty of murder as an aider and abettor the prosecution must prove that defendant knew [his codefendant] intended to kill [the victim], that he intended to aid and abet [his codefendant] in committing the killing, and that he did in fact aid him in that killing . . . .'" (*Johnson*, *supra*, at p. 641.) The Supreme Court concluded that CALCRIM No. 401 "would have cleared up any ambiguity arguably presented by CALCRIM former No. 400's reference to principals being 'equally guilty'" and thus "there was no reasonable likelihood the jurors would have understood the 'equally guilty' language . . . to allow them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather than on defendant's own mental state in aiding and abetting the killing." (*Johnson*, *supra*, at p. 641.)

*Coley*, *supra*, 77 Cal.App.5th 539 is also instructive. The defendant in *Coley* was convicted of second degree murder and attempted murder and appealed the denial of his petition for resentencing under section 1172.6. (*Coley*, *supra*, at pp. 541-542.) The trial court concluded that the record of conviction showed the jury had found express malice, i.e., a specific intent to unlawfully kill, when it convicted the defendant of attempted murder, and therefore denied the petition. (*Id*. at p. 545.) The Court of Appeal affirmed, concluding that the defendant's conviction for attempted murder "demonstrates that he was convicted of second degree murder with express rather than implied malice." (*Id*. at p. 547.) The court explained that the defendant was "convicted of murder based on his aiding and abetting of the same shooting that gave rise to the attempted murder conviction" and that "[t]he jury was instructed by CALCRIM No. 600 that attempted murder requires a determination that 'the defendants intended to kill that person.'" (*Ibid*.) "[B]y finding [the defendant] guilty of attempted murder, the jury necessarily found he had personally harbored intent to kill or express malice when he aided and abetted the second degree murder." (*Ibid*.)

The amendments to sections 188 and 189 are not relevant to defendant's case. Thus, he cannot show he "could not presently be convicted of murder . . . because of changes to [s]ection 188 or 189 made effective January 1, 2019," a statutorily mandated prerequisite for a section 1172.6 petition. (§ 1172.6, subd. (a).) Defendant is ineligible for relief under section 1172.6 as a matter of law. Consequently, we conclude the trial court properly denied defendant's section 1172.6 petition.

22

IV.

DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

SLOUGH
J.